Walter E. RYAN, Jr., In the right of and for the benefit of Maxim Integrated Products, Inc., Plaintiff,

v.

John F. GIFFORD, James R. Bergman, B. Kipling Hagopian, A.R. Frank Wazzan, Eric P. Karros, M.D. Sampels, Defendants,

and

Maxim Integrated Products, Inc., Nominal Defendant.

Civil Action No. 2213–N.

Court of Chancery of Delaware, New Castle County.

Submitted: Jan. 29, 2007.
Decided: Feb. 6, 2007.

Norman M. Monhait, of Rosenthal Monhait & Goddess, P.A., Wilmington, Delaware; of Counsel: Krislov & Associates, Ltd., Chicago, Illinois, Attorneys for Plaintiff.

Peter J. Walsh Jr. and Timothy R. Dudderar, of Potter Anderson & Corroon LLP, Wilmington, Delaware; of Counsel: John M. Potter, of Quinn Emanuel Urquhart Oliver & Hedges LLP, San Francisco, California, Attorneys for Individual Defendants James R. Bergman, B. Kipling Hagopian, A.R. Frank Wazzan, Eric P. Karros, and M.D. Sampels.

Jeffrey L. Moyer and Kelly E. Farnan, of Richards Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Individual Defendant John F. Gifford.

J. Jackson Shrum, of Harvey Pennington, Ltd., Wilmington, Delaware; of Counsel: Michael J. Ioannou, of Ropers Majeski Kohn & Bentley, San Jose, California, Attorney for Nominal Defendant.

### *OPINION*

CHANDLER, Chancellor.

On March 18, 2006, *The Wall Street Journal* sparked controversy throughout the investment community by publishing a one-page article, based on an academic's statistical analysis of option grants, which revealed an arguably questionable compensation practice. Commonly known as backdating, this practice involves a company issuing stock options to an executive on one date while providing fraudulent documentation asserting that the options were actually issued earlier. These options may provide a windfall for executives because the falsely dated stock option grants often coincide with market lows. Such timing reduces the strike prices and inflates the value of stock options, thereby increasing management compensation. This practice allegedly violates any stock option plan that requires strike prices to be no less than the fair market value on the date on which the option is granted by the board. Further, this practice runs afoul of many state and federal common and statutory laws that prohibit dissemination of false and misleading information.

After the article appeared in the Journal, Merrill Lynch issued a report demonstrating that officers of numerous companies, including Maxim Integrated

Products, Inc., had benefited from so many fortuitously timed stock option grants that backdating seemed the only logical explanation. The report engendered this action.

Plaintiff Walter E. Ryan alleges that defendants breached their duties of due care and loyalty by approving or accepting backdated options that violated the clear letter of the shareholder-approved Stock Option Plan and Stock Incentive Plan ("option plans"). Individual defendants move to stay this action in favor of earlier filed federal actions in California ("federal actions"). In the alternative, they move to dismiss this action on its merits.

In this Opinion, I grant individual defendants' motion to dismiss all claims arising *before* April 11, 2001. I deny the remainder of the individual defendants' motion to stay or dismiss.

## I. FACTS

Maxim Integrated Products, Inc. is a technology leader in design, development, and manufacture of linear and mixed-signal integrated circuits used in microprocessor-based electronic equipment. From 1998 to mid–2002 Maxim's board of directors and compensation committee granted stock options for the purchase of millions of shares of Maxim's common stock to John F. Gifford, founder, chairman of the board, and chief executive officer, pursuant to shareholder-approved stock option plans filed with the Securities and Exchange Commission. Under the terms of these plans, Maxim contracted and represented that the exercise price of all stock options granted would be no less than the fair market value of the company's common stock, measured by the publicly traded closing price for Maxim stock on the date of the grant. Additionally, the plan identified the board or a committee

designated by the board as administrators of its terms.

Ryan is a shareholder of Maxim and has continuously held shares since his Dallas Semiconductor Incorporated shares were converted to Maxim shares upon Maxim's acquisition of Dallas Semiconductor on April 11, 2001. He filed this derivative action on June 2, 2006, against Gifford; James Bergman, B. Kipling Hagopian, and A.R. Frank Wazzan, members of the board and compensation committee at all relevant times; Eric Karros, member of the board from 2000 to 2002, and M.D. Sampels, member of the board from 2001–2002. Ryan alleges that nine specific grants were backdated between 1998 and 2002, as these grants seem too fortuitously timed to be explained as simple coincidence. All nine grants were dated on unusually low (if not the lowest) trading days of the years in question, or on days immediately before sharp increases in the market price of the company.

### A. Genesis of these Claims

As practices surrounding the timing of options grants for public companies began facing increased scrutiny in early 2006, Merrill Lynch conducted an analysis of the timing of stock option grants from 1997 to 2002 for the semiconductor and semiconductor equipment companies that comprise the Philadelphia Semiconductor Index. Merrill Lynch measured the aggressiveness of timing of option grants by examining the extent to which stock price performance subsequent to options pricing events diverges from stock price performance over a longer period of time. "Specifically, it looked at annualized stock price returns for the twenty day period subsequent to options pricing in comparison to stock price returns for the calendar year in

which the options were granted."[1] In theory, companies should not generate systematic excess return in comparison to other investors as a result of the timing of options pricing events. "[I]f the timing of options grants is an arm's length process, and companies have [not] systematically taken advantage of their ability to backdate options within the [twenty] day windows that the law provided prior to the implementation of Sarbanes Oxley in 2002, there shouldn't be any difference between the two measures."[2] Merrill Lynch failed to take a position on whether Maxim actually backdated; however, it noted that if backdating did not occur, management of Maxim was remarkably effective at timing options pricing events.

With regard to Maxim, Merrill Lynch found that the twenty-day return on option grants to management averaged 14% over the five-year period, an annualized return of 243%, or almost ten times higher than the 29% annualized market returns in the same period.

### B. Similar Pending Actions

The Merrill Lynch report formed the bases for other derivative lawsuits. Robert McKinney filed a federal action in the Northern District of California on May 22, 2006, three weeks before this action was filed. Eugene Horkay, Jr. followed suit, filing an identical action in the same court two days later. The Northern District of California entered an order on June 14, 2006, consolidating these suits and all subsequently filed suits. Under this order, two more actions were consolidated. All four derivative plaintiffs have stipulated to consolidate and agreed to a lead plaintiff and lead counsel structure. Further, defendants and plaintiffs have entered into a

stipulated scheduling order approved by that court.[3]

The federal action is similar to the Delaware action. The federal plaintiffs posit claims of backdating based on the Merrill Lynch report. They specifically challenge ten option grants, alleging that backdating occurred. Further, they contend that this violation of their options plan exposes Maxim to adverse tax consequences.

The federal action differs in some respects, however. First, that action alleges that other officers, in addition to Gifford, benefited from backdated options. Further, the federal action names more director defendants. In addition to breach of fiduciary duty claims, the federal plaintiffs assert claims for aiding and abetting breach of fiduciary duty, abuse of control, gross mismanagement, constructive fraud and corporate waste. The federal plaintiffs also allege violations of sections 10(b) and 14(a) of the Securities Exchange Act of 1934 and of Rules 10b–5 and 14a–9.

In addition to the Delaware action and the federal action, Louisiana Sheriff's Pension & Relief Fund filed a derivative action in California state court that makes similar allegations as the federal derivative action and this action. The California state court action, filed on June 16, 2006, names sixteen defendants, including all defendants in the Delaware action. The judge in the state court action granted a stay in that proceeding.

### II. CONTENTIONS

Plaintiff contends that all defendants breached their fiduciary duties to Maxim and its shareholders. The shareholder-approved 1983 Stock Option Plan and 1999

---

1. Compl. Ex. 1 at 1–2.

2. Compl. Ex. 1 at 2.

3. *In re Maxim Integrated Prod., Inc. Derivative Litig.*, No. C–06–3344 JW (N.D.Cal.).

Stock Incentive Plan bound the board of directors to set the exercise price according to the terms of the plans. The 1999 plan allowed the board to designate a committee to approve the plans. The designated compensation committee, consisting of Bergman, Hagopian, and Wazzan, approved option grants after 1999. Plaintiff alleges that from 1998 to 2002, the board actively allowed Maxim to backdate at least nine option grants issued to Gifford, in violation of shareholder-approved plans, and to purposefully mislead shareholders regarding its actions. As a result of the active violations of the plan and the active deceit, plaintiff contends that Maxim received lower payments upon exercise of the options than would have been received had they not been backdated. Further, Maxim suffers adverse effects from tax and accounting rules. The options priced below the stock's fair market value on the date of the grant allegedly bring the recipient an instant paper gain. At the time, such compensation had to be treated as a cost to the company, thereby reducing reported earnings and resulting in overstated profits. This likely necessitates revision of the company's financial statements and tax reporting. Moreover, Gifford, the recipient of the backdated options, is allegedly unjustly enriched due to receipt of compensation in clear violation of the shareholder-approved plans.

Defendants respond with a motion asserting three theories under which this Court should stay this action in favor of the federal action or, in the alternative, numerous theories under which this Court should dismiss this action. First, defendants move to stay this action pursuant to the Supreme Court of Delaware's ruling in *Mc Wane Cast Iron Pipe Corp. v. McDowell–Wellman Engineering Co.*[4] They assert that because this is a second-filed action, I should grant a stay under principles of comity. In the alternative, defendants contend that the doctrine of *forum non conveniens* supports a stay because the California action provides a more convenient forum. Finally, defendants insist that this case should be stayed because the result in California may render the Delaware action moot.

Defendants also seek dismissal under numerous theories. First, defendants allege that plaintiff fails to meet his burden of pleading demand futility with particularity because plaintiff does not show that the companies' directors were incapable of making an impartial decision regarding litigation. Second, defendants state that plaintiff lacks standing to assert seven of his nine claims because he was not a shareholder when those challenged transactions occurred. Third, defendants assert that plaintiff fails to state a claim for breach of fiduciary duty because plaintiff fails to rebut the business judgment rule. Fourth, defendants contend that the statute of limitations bars plaintiff's claims and that plaintiff cannot save his claims by relying on any tolling doctrines because all relevant information was public. Finally, defendants assert that plaintiff's unjust enrichment claim fails because plaintiff does not allege the manner in which Gifford was unjustly enriched. Ryan never suggests that Gifford has exercised any of the allegedly backdated options or sold any stock. Thus, defendants argue, there is no enrichment.

I will address these assertions in turn.

## III. MOTION TO STAY

### A. *McWane* Doctrine

Defendants move to stay this action pursuant to the *McWane* doctrine, arguing

---

4. 263 A.2d 281 (Del.1970).

that the *"McWane* doctrine is most useful in derivative actions because such actions present the greatest probability for identical claims to be presented to multiple courts at the same time." [5] Thus, this Court should use its broad discretion under the first-filed rule to grant a stay.

■ The Supreme Court of Delaware strongly encourages this Court to freely exercise its discretion "in favor of the stay when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues." [6] Further, it recognizes that "considerations of comity and the necessities of an orderly and efficient administration of justice" [7] often require that "litigation should be confined to the forum in which it first commenced, and a defendant should not be permitted to defeat the plaintiff's choice of forum in pending suit." [8] The application of this doctrine, however, presents great difficulty in shareholder derivative actions.

■ A shareholder plaintiff does not sue for his direct benefit. Instead, he alleges injury to and seeks redress on behalf of the corporation. Further, the board or any shareholder with standing may represent the injured party. Thus, this Court places less emphasis on the celerity of such plaintiffs and grants less deference to the speedy plaintiff's choice of forum. Because the plaintiff is not the directly injured party, this Court proceeds cautiously when faced with the question of whether to defer to a first-filed derivative suit, "examin[ing] more closely the relevant factors bearing on where the case should best proceed, using something akin to a *forum non conveniens* analysis." [9]

For example, in *Biondi v. Scrushy*, Vice Chancellor Strine declined to stay a later-filed Delaware action where he determined that the first-filed Alabama complaint was substandard compared to the Delaware action. [10] Conversely, in *Derdiger v. Tallman*, I granted a stay in favor of a non-Delaware action where that complaint was more fulsomely pleaded than the Delaware complaint. [11] Thus, this Court has recognized that the adequacy of the complaint is a more important factor than time of filing in a *Mc Wane* analysis of shareholder derivative actions, so much so that this Court will, in certain instances, grant or deny a stay based on this factor alone.

■ A similarly important factor in determining whether a stay is appropriate in a derivative action is a court's ability to render justice. Rendering justice necessarily entails accurately applying controlling law, in this case Delaware law. In many instances, this Court has recognized without hesitation that sister state courts and federal courts are capable of applying Delaware law and providing complete justice to parties. [12] At the same time, however, Delaware courts have a "significant and substantial interest in overseeing the conduct of those owing fiduciary duties to shareholders of Delaware corporations." [13]

---

5. Defs.' Opening Br. in Supp. of Mot. to Dismiss at 10.

6. *McWane Cast Iron Pipe Corp.*, 263 A.2d at 283.

7. *Id.*

8. *Id.*

9. *Biondi v. Scrushy*, 820 A.2d 1148, 1159 (Del.Ch.2003).

10. *Id.* at 1160–63.

11. 773 A.2d 1005 (Del.Ch.2000).

12. *In re Westell Techs., Inc.*, 2001 WL 755134 (Del.Ch. June 28, 2001).

13. *In re Chambers Dev. Co. S'holders Litig.*, 1993 WL 179335, at *8 (Del.Ch. May 20, 1993).

This interest increases greatly in actions addressing novel issues. In *In re Chambers Development Co.*, this Court noted, as it has in the past, that "novel and substantial issues of Delaware corporate law are best resolved in Delaware courts." [14] Thus, while the application of Delaware law in most cases is not determinative, more weight must be accorded to this factor where the law is novel. Such is the case here.

The allegations in this case involve backdating option grants and whether such practice violates one or more of Delaware's common law fiduciary duties. This question is one of great import to the law of corporations. It encompasses numerous issues, including the propriety of this type of executive compensation, requisite disclosures that must accompany such compensation, and the legal implications of intentional non-compliance with shareholder-approved plans (if such practices are deemed noncompliant), to name only a few. Investors are challenging this very practice in many courts throughout the United States, including this Court. [15] Delaware courts have not as yet addressed these fundamental issues. Nevertheless, Delaware law directly controls and affects many of the option backdating cases. An answer regarding the legality of these practices pursuant to Delaware law plainly will affect not only the parties to this action, but also parties in other civil and criminal proceedings where Delaware law controls or applies. By directly stating the fiduciary principles applicable in this context, Delaware courts may remove doubt regarding Delaware law and avoid inconsistencies that might arise in the event other state or federal courts, in applying Delaware law, reach differing conclusions. Because Delaware has an overwhelming interest in resolving questions of first impression under Delaware law, I deny defendants' *McWane*-based stay request. [16]

### B. Forum Non Conveniens

■ Defendants also seek a stay pursuant to the doctrine of *forum non conveniens*. Specifically, they contend that the pendency of the first-filed federal derivative action warrants a stay because " 'it makes little sense to duplicate the efforts of the federal court.' " [17] Defendants assert that: there is no reason to burden the defendants or waste the resources of the court with dual litigation of the same matters; the federal forum offers greater ease of access to proof because potential wit-

14. *Id.* at *9.

15. *See, e.g., AFSCME Employees' Pension Planet v. Jobs*, No. 06–5007 (N.D.Cal.); *In re Caremark Rx, Inc. Derivative Litig.*, Master Docket No. 3:06–cv–00535 (M.D.Tenn.); *Brandin v. Darwin*, C.A. No. 2123–N (Del. Ch.). Additionally, numerous lawyers and law firms are compiling regularly updated lists of companies involved in securities fraud class actions and shareholder derivative class actions challenging timing of stock option grants. As of January 26, 2007, between 120–170 companies were implicated in lawsuits or investigations. *See, e.g.*, Lieff Cabraser Heimann & Bernstein, LLP, Securities and Investment Fraud: Frequently Asked Questions on Stock Options Backdating and Stock Options Grants, http://www.lieffcabrasersecurities.com/options-backdating-faq.php# 9 (last visited Jan. 30, 2007).

16. Although not determinative to my analysis, it is noteworthy that the California federal actions were filed only three weeks before this action, and have yet to reach oral argument on the motion to dismiss those cases. The California state court action has been stayed, and so is likely even further behind this action.

17. Defs.' Opening Br. in Supp. of Mot. to Dismiss at 17 (quoting *Friedman v. Alcatel Alsthom*, 752 A.2d 544, 555 n. 46 (Del.Ch. 1999)).

nesses and documents are located in California; the federal forum allows for compulsory process over a greater number of potential witnesses; and federal courts have proven their ability to appropriately apply Delaware law.

 This Court examines six factors when assessing whether stay or dismissal is appropriate under a *forum non conveniens* analysis: "1) the applicability of Delaware law, 2) the relative ease of access of proof, 3) the availability of compulsory process for witnesses, 4) the pendency or non-pendency of a similar action or actions in another jurisdiction, 5) the possibility of a need to view the premises; and 6) all other practical considerations that would make the trial easy, expeditious, and inexpensive."[18] A showing of mere convenience, however, will not warrant stay or dismissal under *forum non conveniens*. Instead, a party seeking to stay or dismiss on the grounds of *forum non conveniens* must demonstrate that litigating in Delaware would subject it to *overwhelming* hardship.[19] The facts of this case show no such insurmountable burden.

First, Delaware law controls. Thus, the applicability of Delaware law clearly favors denial of the motion. Second, most corporate litigation in the Court of Chancery involves companies with documents and witnesses located outside of Delaware. Defendants point to no documents they will be unable to produce and no witnesses who will be subjected to overwhelming hardship by testifying in Delaware. While it is true that California might provide a more convenient location, motions to dismiss a plaintiff's choice of forum are not granted for defendants' mere convenience.

Thus, there is no showing that the "ease of access of proof" standard supports a stay or dismissal. Third, "the availability of compulsory process of witnesses" while convenient in California, is not determinative. Defendants fail to identify necessary witnesses not subject to process; nor will this Court presume that such witnesses exist. Fourth, while a separate pending action exists, defendants provide no evidence that litigating both matters will cause the type of overwhelming hardship necessary under the *forum non conveniens* doctrine. Fifth, there is no indication that a view of any premises will be necessary. Nor do defendants assert any other considerations that would make trial in Delaware a real hardship, let alone a substantial and overwhelming hardship. Therefore, the doctrine of *forum non conveniens* does not require that I grant a stay in favor of the first-filed action.

### C. California Actions Will Render Delaware Actions Moot

In a final effort to convince this Court to stay this action, defendants state that adjudication of the California actions will render the Delaware action moot. Defendants fail, however, to provide any explanation as to why they make this assertion. Without more, I cannot hold that this action should be stayed. Thus, I deny a motion to stay on the grounds that adjudication of the California actions will render the Delaware action moot.

### IV. MOTION TO DISMISS

### A. Futility of Demand Under Rule 23.1

Defendants state that plaintiff has failed to make demand or prove demand futility.

---

18. *In re Chambers Dev. Co. S'holder Litig.*, 1993 WL 179335, at *6.

19. *Berger v. Intelident Solutions, Inc.*, 906 A.2d 134 (Del.2006) (reversing this Court's decision to grant stay where defendants showed that litigating in Florida would have been less burdensome because there was no showing of overwhelming hardship).

That is, defendants contend that the complaint lacks particularized facts that either establish that a majority of directors face a "substantial likelihood" of personal liability for the wrongdoing alleged in the complaint or render a majority of the board incapable of acting in an independent and disinterested fashion regarding demand.

When a shareholder seeks to maintain a derivative action on behalf of a corporation, Delaware law requires that shareholder to first make demand on that corporation's board of directors, giving the board the opportunity to examine the alleged grievance and related facts and to determine whether pursuing the action is in the best interest of the corporation. This demand requirement works "to curb a myriad of individual shareholders from bringing potentially frivolous lawsuits on behalf of the corporation, which may tie up the corporation's governors in constant litigation and diminish the board's authority to govern the affairs of the corporation." [20]

This Court has recognized, however, that in some cases demand would prove futile. Where the board's actions cause the shareholders' complaint, "a question is rightfully raised over whether the board will pursue these claims with 100% allegiance to the corporation, since doing so may require that the board sue *itself* on behalf of the corporation." [21] Thus, in an effort to balance the interest of preventing "strike suits motivated by the hope of creating settlement leverage through the prospect of expensive and time-consuming litigation discovery [with the interest of encouraging] suits reflecting a reasonable apprehension of actionable director malfeasance that the sitting board cannot be expected to objectively pursue on the corporation's behalf," Delaware law recognizes two instances where a plaintiff is excused from making demand.[22] Failure to make demand may be excused if a plaintiff can raise a reason to doubt that: (1) a majority of the board is disinterested or independent or (2) the challenged acts were the product of the board's valid exercise of business judgment.[23]

The analysis differs, however, where the challenged decision is not a decision of the board in place at the time the complaint is filed. In *Rales v. Blasband*, the Supreme Court of Delaware held that "[w]here there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application." [24] Stated differently, "the absence of board action ... makes it impossible to perform the essential inquiry contemplated by *Aron-*

---

20. *Sanders v. Wang*, 1999 WL 1044880, at *11 (Del.Ch. Nov.10, 1999).

21. *Id.* at *12.

22. *Khanna v. McMinn*, 2006 WL 1388744, at *11 n. 50 (Del.Ch. May 9, 2006) (citations omitted).

23. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). Creating such a reason to doubt is a difficult feat under Delaware law. Rule 23.1 requires that the complaint "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Ch. Ct. R. 23.1. That is, plaintiff must "comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings" in order to create a reason to doubt that a majority of the board is disinterested or independent or that the board's action was a valid exercise of business judgment, thereby excusing plaintiff's failure to make demand. *Zimmerman ex rel. Priceline.com, Inc. v. Braddock*, 2002 WL 31926608, at *7 (Del.Ch. Dec.20, 2002).

24. 634 A.2d 927, 933 (Del.1993).

*son.*[25] Accordingly, where the challenged transaction was not a decision of the board upon which plaintiff must seek demand, plaintiff must "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[26]

Here, the compensation committee, not the board, approved the challenged option grants. Plaintiff concedes that the option plans provided the board with express authority to delegate to a committee its power to grant options according to the plans. Additionally, 8 *Del. C.* § 141(c) provides that the board of directors may designate committees and "[a]ny such committee ... shall have and may exercise all powers and authority of the board of directors in the management of the business and affairs of the corporation." Further, "a member of the board of directors ... shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon any such information, opinions, reports or statements presented ... by committees of the board of directors."[27] At first glance, it appears that because this decision was not a board decision, plaintiff must comply with *Rales,* alleging facts that raise a reason to doubt that the board members could have prop-

erly exercised their independent and disinterested business judgment in responding to a demand. The unique facts here, however, present a different situation. Maxim's board consisted of six members at all relevant times. The compensation committee, at all relevant times, consisted solely of three members, Bergman, Wazzan, and Hagopian. Thus, one half of the current board members approved each challenged transaction. Where at least one half or more of the board in place at the time the complaint was filed approved the underlying challenged transactions, which approval may be imputed to the entire board for purposes of proving demand futility, the *Aronson* test applies.

The spirit of *Rales,* if not the letter, supports this conclusion. In *Rales,* the current board was not the same board that originally made the decision on which the action was based. Consequently, the Supreme Court of Delaware held that the usual test for determining a derivative plaintiff's compliance with the demand obligation did not apply. Because the current board did not make the underlying challenged decision, it became impossible to test whether the current directors acted in conformity with the business judgment rule in approving the challenged transaction.[28] That impossibility is not present here.[29]

25. *Id.*

26. *Id.* at 933–34.

27. 8 *Del. C.* § 141(e).

28. *Rales,* 634 A.2d at 932–35.

29. *Rales,* 634 A.2d at 932–35. The Supreme Court identified three scenarios in which it would be inappropriate to challenge the business judgment of a current board of directors for purposes of demand under Rule 23.1:(1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been re-

placed; (2) where the subject of the derivative suit is not a business decision of the board; (3) and where the decision being challenged was made by the board of a different corporation. *Id.* at 934. The Supreme Court included the second scenario out of a concern that demand upon a board should not be excused when a board did not have the opportunity to consider a corporate action. Demand "permits the board to have the opportunity to take action where it has not previously considered doing so." *Id.* at 934 n. 9.

This concern is not implicated where the board has delegated decision-making authority to a committee comprising one half or

### 1. Demand is Futile Under the Second Prong of Aronson

Because the compensation committee attacked by plaintiff constitutes a majority of the board, the business judgment analysis under the second prong of *Aronson* may be readily applied. Plaintiffs may prove demand futility by raising a reason to doubt whether the challenged transactions were a valid exercise of business judgment.

Plaintiff alleges that the challenged transactions raise a reason to doubt whether the option grants were a valid exercise of business judgment. Specifically, plaintiff states that the terms of the stock option plans *required* that "[t]he exercise price of each option shall be not less than one hundred percent (100%) of the fair market value of the stock subject to the option on the date the option is granted."[30] The board had no discretion to contravene the terms of the stock option plans. Altering the actual date of the grant so as to affect the exercise price contravenes the plan. Thus, knowing and intentional violations of the stock option plans, according to the plaintiff, cannot be an exercise of business judgment. I conclude that the unusual facts alleged raise a reason to doubt that the challenged transactions resulted from a valid exercise of business judgment.

In *Sanders v. Wang*,[31] then-Vice Chancellor Steele addressed the demand futility issue in a similar factual context. There, shareholders filed a derivative suit alleging that directors granted stock in excess of the number *authorized* by the employee stock ownership plan.[32] Then–Vice Chancellor Steele held that "the plaintiffs have sufficiently alleged facts which, taken as true, show that the CA board violated an express KESOP provision limiting the number of shares they were authorized to award.... Thus, the facts raise doubt that the board's actions resulted from a valid exercise of business judgment."[33] A board's knowing and intentional decision to exceed the shareholders' grant of express (but limited) authority raises doubt regarding whether such decision is a valid exercise of business judgment and is sufficient to excuse a failure to make demand.

The situation here closely mirrors that in *Sanders v. Wang*. Plaintiff supports his claim that backdating occurred by pointing to nine option grants over a six-year period where each option was granted during a low point. That is, every challenged option grant occurred during the lowest market price of the month or year in which it was granted. In addition to pointing specifically to highly suspicious timing, plaintiff further supports his allegations with empirical evidence suggesting that backdating occurred. The Merrill Lynch analysis measured the extent to which stock price performance subsequent to options pricing events diverged from stock price performance over a longer period of time to measure the aggressiveness of the timing of option grants and found that Maxim's average annualized return of 243% on option grants to management was almost ten times higher than the 29% annualized market returns in the same period. This timing, by my judgment and by support of

---

more of its members and a shareholder seek to challenge an action taken by that committee. Where half or more of the board has already approved a corporate action, even acting through a committee, there is no need for a shareholder to give the entire board a second bite at the apple.

**30.** Compl. at ¶ 23.

**31.** 1999 WL 1044880 (Del.Ch. Nov. 10, 1999).

**32.** *Id.*

**33.** *Id.* at *14–15.

empirical data, seems too fortuitous to be mere coincidence. The appearance of impropriety grows even more when one considers the fact that the board granted options, not at set or designated times, but by a sporadic method.[34]

Plaintiff supports his breach of fiduciary duty claim and his assertion that demand is futile by pointing to the board's decision to ignore limitations set out in the company's stock options plans. The plans do not grant the board discretion to alter the exercise price by falsifying the date on which options were granted. Thus, the alleged facts suggest that the director defendants violated an express provision of two option plans and exceeded the shareholders' grant of express authority.

Plaintiff here points to specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures. Such facts, in my opinion, provide sufficient particularity in the pleading to survive a motion to dismiss for failure to make demand pursuant to Rule 23. 1.[35]

## 2. *Demand is Futile Under Rales*

Even if the decision by the compensation committee was not imputable to the entire board, thereby implicating *Aronson,* demand would remain futile under the *Rales* test. Where the board has not yet made a decision, demand is excused when the complaint contains particularized facts creating a reason to doubt that a majority of the directors would have been independent and disinterested when considering the demand. Directors who are sued have a disabling interest for pre-suit demand purposes when "the potential for liability is not a mere threat but instead may rise to a substantial likelihood." [36]

A director who approves the backdating of options faces at the very *least* a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty. Backdating options qualifies as one of those "rare cases [in which] a transaction

---

**34.** Defendants argue repeatedly that plaintiff's allegations ultimately rest upon nothing more than statistical abstractions. Nevertheless, this Court is required to draw reasonable inferences and need not be blind to probability. True, the Merrill Lynch report does not state conclusively that Gifford's options were *actually* backdated. Rather, it emphatically suggests that either defendant directors knowingly manipulated the dates on which options were granted, or their timing was extraordinarily lucky. Given the choice between improbable good fortune and knowing manipulation of option grants, the Court may reasonably infer the latter, even when applying the heightened pleading standards of Rule 23.1.

**35.** Defendants also object that plaintiff's allegations are not particularized for purposes of Rule 23.1 because they do not directly allege

knowledge on behalf of the directors. Yet, it is difficult to understand how a plaintiff can allege that directors backdated options *without* simultaneously alleging that such directors *knew* that the options were being backdated. After all, any grant of options had to have been approved by the committee, and that committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant. Nor is it any defense to say that directors might not have had knowledge that backdating violated their duty of loyalty. Directors of Delaware corporations should not be surprised to find that lying to shareholders is inconsistent with loyalty, which necessarily requires good faith. *See, e.g., Malone v. Brincat,* 722 A.2d 5, 11–12 (Del.1998).

**36.** *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268, 1269 (Del.Ch.1995).

may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."[37] Plaintiff alleges that three members of a board *approved* backdated options, and another board member accepted them. These are sufficient allegations to raise a reason to doubt the disinterestedness of the current board and to suggest that they are incapable of impartially considering demand.[38]

### B. Failure To State a Claim Upon Which Relief Can Be Granted

Defendants assert that plaintiff fails to state a claim for breach of fiduciary duty. This defense, stripped to its essence, states that in order to survive a motion to dismiss on a fiduciary duty claim, the complaint must rebut the business judgment rule. That is, plaintiff must raise a reason to doubt that the directors were disinterested or independent. Where the complaint does not rebut the business judg-

ment rule, plaintiff must allege waste. Plaintiff here, argue the defendants, fails to do either. Further, there is no evidence that the defendants acted intentionally, in bad faith, or for personal gain. Therefore, so the argument goes, plaintiff fails to plead facts sufficient to rebut the business judgment rule and cannot maintain an action for breach of fiduciary duties.

Plaintiff responds that the same facts that establish demand futility under the second prong of *Aronson v. Lewis*—that is, the directors' purposeful failure to honor an unambiguous provision of a shareholder approved stock option plan—also rebuts the business judgment rule for the purpose of a motion to dismiss for failure to state a claim upon which relief can be granted.

### 1. Rule 12(b)(6) v. Rule 23.1

■ This Court follows well-settled standards governing motions to dismiss for

---

**37.** *Aronson*, 473 A.2d at 815.

**38.** Nor do defendant directors' concerns necessarily end with consideration of the duty of loyalty. Were the board to pursue a derivative suit, it might unearth facts that would subject directors to further civil and criminal liability. Four board members, Gifford, Bergman, Wazzan, and Hagopian were familiar with Maxim's stock option plans. In 1999, they recommended the most recent options plan and submitted it for shareholder approval accompanied by their own directorial stamps of approval. In 2000 and 2001 proxy statements filed pursuant to section 14(a) of the Securities Exchange Act of 1934, Bergman, Wazzan, and Hagopian, representing half of the board, verified that they bore direct responsibility for granting options and that they granted all options according to the options plan. *See Wal–Mart Stores v. AIG Life Ins. Co.*, 860 A.2d, 312, 320 n. 28 (citing *DiLorenzo v. Edgar*, 2004 WL 609374, at \*2 (D.Del. Mar. 24, 2004) for the proposition that "[o]n a motion to dismiss, the court may take judicial notice of the contents of docu-

ments *required by law to be filed, and actually filed, with federal or state officials "*). Further, Bergman, Wazzan, and Hagopian were also members of the audit committee, and as such, directly responsible for approving any false financial statements that resulted from mischaracterization of these option grants. Thus, they might be exposed to potential criminal liability for securities fraud, tax fraud, and mail and wire fraud. *See* Martha Boersch and Renee Beltranena Bea, *The Criminal Implication of Backdating Stock Options,* The Metropolitan Corp. Counsel, Nov. 2006, at 8 (discussing potential criminal liability associated with backdating options and detailing criminal charges presently filed against executives associated with backdating options); *see also* Linda Chatman Thomsen, Speech by SEC Staff in Washington, D.C.: Options Backdating: The Enforcement Perspective (Oct. 30, 2006), *available at* http://www. sec.gov/news/speech/2006/spch103006l ct.htm; Kenneth Winer, Elizabeth Gray and Pamela Johnson, Options Backdating: A Practical Guide to the Controversy, Vol. 20 Insights No. 9, p. 2 (Sept.2006).

failure to state a claim. At the motion to dismiss stage, all well-pleaded factual allegations made in the complaint are to be accepted as true.[39] Moreover, this Court must draw all reasonable inferences in favor of the non-moving party, and dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[40] Conclusory allegations are not considered as expressly pleaded facts or factual inferences.[41] Such facts must be put forth in the complaint and not merely in subsequent briefs.[42] In the context of a motion to dismiss for failure to state a claim, however, the pleading standard does not reach so high a bar as Rule 23.1. Thus, where plaintiff alleges particularized facts sufficient to prove demand futility under the second prong of *Aronson,* that plaintiff *a fortiori* rebuts the business judgment rule for the purpose of surviving a motion to dismiss pursuant to Rule 12(b)(6).

## 2. *The Business Judgment Rule and Bad Faith*

 Even if this were not the case, the complaint here alleges bad faith and, therefore, a breach of the duty of loyalty sufficient to rebut the business judgment rule and survive a motion to dismiss. The business affairs of a corporation are to be managed by or under the direction of its board of directors.[43] In an effort to encourage the full exercise of managerial powers, Delaware law protects the managers of a corporation through the business judgment rule. This rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company."[44] Nevertheless, a showing that the board breached either its fiduciary duty of due care or its fiduciary duty of loyalty in connection with a challenged transaction may rebut this presumption. Such a breach may be shown where the board acts intentionally, in bad faith, or for personal gain.[45]

In *Stone v. Ritter,* the Supreme Court of Delaware held that acts taken in bad faith breach the duty of loyalty.[46] Bad faith, the Court stated, may be shown where "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of known duty to act, demonstrating a conscious disregard for his duties."[47] Additionally, other examples of bad faith might exist.[48] These examples include any action that demonstrates a faithlessness or lack of true devotion to the interests of the corporation and its shareholders.

Based on the allegations of the complaint, and all reasonable inferences drawn

---

39. *In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896–7 (Del. 2002)).

40. *Id.*

41. *White v. Panic,* 783 A.2d 543, 549 (Del. 2001).

42. *Orman v. Cullman,* 794 A.2d 5, 28 n. 59 (Del.Ch.2002).

43. 8 *Del. C.* § 141(a).

44. *Aronson,* 473 A.2d at 812.

45. *Malpiede v. Townson,* 780 A.2d 1075, 1093–97 (Del.2001).

46. 911 A.2d 362, 370 (Del.2006).

47. *Id.* at 369.

48. *Id.*

therefrom, I am convinced that the intentional violation of a shareholder approved stock option plan, coupled with fraudulent disclosures regarding the directors' purported compliance with that plan, constitute conduct that is disloyal to the corporation and is therefore an act in bad faith. Plaintiffs allege the following conduct: Maxim's directors affirmatively represented to Maxim's shareholders that the exercise price of any option grant would be no less than 100% of the fair value of the shares, measured by the market price of the shares on the date the option is granted. Maxim shareholders, possessing an absolute right to rely on those assurances when determining whether to approve the plans, in fact relied upon those representations and approved the plans. Thereafter, Maxim's directors are alleged to have deliberately attempted to circumvent their duty to price the shares at no less than market value on the option grant dates by surreptitiously changing the dates on which the options were granted. To make matters worse, the directors allegedly failed to disclose this conduct to their shareholders, instead making false representations regarding the option dates in many of their public disclosures.

I am unable to fathom a situation where the deliberate violation of a shareholder approved stock option plan and false disclosures, obviously intended to mislead shareholders into thinking that the directors complied honestly with the shareholder-approved option plan, is anything but an act of bad faith. It certainly cannot be said to amount to faithful and devoted conduct of a loyal fiduciary. Well-pleaded allegations of such conduct are sufficient, in my opinion, to rebut the business judgment rule and to survive a motion to dismiss.[49]

## C. Standing

Defendants move to dismiss seven of the nine claims asserted in plaintiff's complaint on the grounds that plaintiff lacks standing to assert these claims. According to defendants, plaintiff must have continuous ownership from the time of the transaction in question through the completion of the lawsuit in order to sustain a derivative action. It is unchallenged that plaintiff never owned stock in Maxim before 2001, and plaintiff acquired his stock through a merger, not by operation of law. Only two of the nine challenged transactions occurred while plaintiff held shares. Accordingly, defendant argues that dismissal of all claims arising before April 11, 2001, is proper pursuant to 8 *Del. C.* § 327.

Section 327 of the DGCL exists to prevent the purchasing of shares in order to maintain a derivative action attacking transactions that occurred before the pur-

---

49. I pause here to note the procedural posture of this case. This opinion addresses a motion to dismiss. Thus, neither party has had the benefit of any discovery. At this stage, plaintiffs are afforded certain presumptions of truth. Because of these presumptions, plaintiff may survive a motion to dismiss where the complaint relies on empirical data to support claims of: 1) specific instances of backdating; 2) violations of shareholder-approved plans or some other legal obligation; and 3) fraudulent disclosures regarding compliance with that plan. If, however, this case reaches the trial stage, plaintiff may no longer rely on liberal pleading assumptions. Instead, plaintiff must then rely on evidence presented at trial to demonstrate by a preponderance of the evidence that the defendants in fact backdated options, and thus are not afforded the protections of the business judgment rule. Even at that point, directors may still prevail by meeting the hefty burden of proving that the challenged transactions were entirely fair to the corporation and its shareholders. *See, e.g., In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755–58 (Del.Ch.2005).

chase.[50] It provides that a stockholder seeking to assert a derivative action on behalf of a corporation must have been a stockholder at the time of the transaction complained of, or his shares must have devolved upon him by operation of law.[51] Additionally, he must continuously hold stock through completion of the litigation.[52]

In most instances, Delaware courts have strictly construed this statute. Dispositive in this case is this Court's holding in *Saito v. McCall*.[53] There, two stockholders filed a derivative action, but their first claim alleged pre-merger breaches of fiduciary duties. The Court held that stockholders who obtained their stock pursuant to a stock-for-stock merger lacked standing to sue derivatively for transactions occurring before the merger.[54]

■ Plaintiff here faces the same problem. He became a shareholder on April 11, 2001, by way of a merger, not by operation of law. Therefore, he lacks standing to assert claims arising before April 11, 2001. The cases where this Court has applied section 327 with some leniency are not applicable here. For example, in the case of *Helfand v. Gambee*, plaintiff lost standing by virtue of reorganization.[55] To the contrary, plaintiff here argues that he *gained* standing by virtue of a merger. The law here is settled. Plaintiff may not assert claims arising before his ownership interest materialized on April 11, 2001.

### D. Statute Of Limitations

Defendants contend that the statute of limitations of 10 *Del. C.* § 8106 bars plaintiff's claims because none of the challenged transactions occurred within the past three years. Further, defendants assert that plaintiff cannot save his claims by relying on any tolling doctrines since the information was publicly available. Plaintiff concedes as much by relying on the Merrill Lynch report as the basis of his claims, which was prepared using publicly disclosed information and historical stock prices. Thus, defendants argue, the statute of limitations bars all claims asserted in this complaint.

■ This Court applies a three-year statute of limitations to equitable claims only by analogy. The statute of limitations begins to run at the time the alleged harmful act is committed, regardless of plaintiff's knowledge of the act. Plaintiff, however, may toll the limitations period by specifically alleging that the facts were "so hidden that a reasonable plaintiff could not have made timely discovery of an injury necessary to file a complaint." [56] If plaintiff sufficiently meets his burden of showing that the statute was tolled, relief extends only until plaintiff is on inquiry notice. That is to say, tolling ends where plaintiff discovers, or in the exercise of reasonable diligence should have discovered, his injury.[57]

■ Plaintiff asserts that the doctrine of fraudulent concealment tolls the statute

**50.** 8 *Del. C.* § 327.

**51.** *Id.*

**52.** *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del.1984).

**53.** C.A. No. 17132–NC, slip op., 2004 WL 3029876 (Del.Ch. Dec. 20, 2004).

**54.** *Id.* at *18–23.

**55.** 136 A.2d 558 (Del.Ch.1957).

**56.** *Smith v. McGee*, 2006 WL 3000363, at *3 (Del.Ch. Oct.16, 2006).

**57.** *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4–6 (Del.Ch. July 17, 1998) (citations omitted).

of limitations in this case. Fraudulent concealment "requires an affirmative act of concealment by a defendant—an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry."[58]

The allegations in the complaint satisfy the requirements of the doctrine of fraudulent concealment. Defendants allegedly caused Maxim to falsely represent that the exercise price of all the stock options it granted pursuant to its stock option plans was no less than the fair market value of Maxim's common stock, measured by the publicly traded closing price for Maxim stock on the date of the grant. To the extent that the date on which the grant was issued is not the same as the date that the defendants, in public filings, represented that the grant was issued, defendants affirmatively acted to conceal a fact that prevented plaintiff from gaining material relevant knowledge in an attempt to put plaintiff off the trail of inquiry. Plaintiff may rely on public filings and accept them as true, and need not assume that directors and officers will falsify such filings. Accordingly, where plaintiff alleges that defendants intentionally falsified public disclosures, defendants may not rely on the statute of limitations as a defense until plaintiff is placed on inquiry notice that such filings were fraudulent.

Defendants argue that there is no fraudulent concealment since Merrill Lynch based its report on public disclosures and plaintiff bases his complaint on the Merrill Lynch report. That is, defendants insist that Ryan, through investigation, could have discovered the same information that Merrill Lynch discovered. This defense is unconvincing. Shareholders may be expected to exercise reasonable diligence with respect to their shares, but this diligence does not require a shareholder to conduct complicated statistical analysis in order to uncover alleged malfeasance.[59] The above-mentioned facts, in conjunction with an alleged affirmative cover up, convince me that the actions were fraudulently concealed and, thus, defendants may not rely on the statute of limitations as a defense. Inaccurate public representations as to whether directors are in compliance with shareholder-approved stock option plans constitute fraudulent concealment of wrongdoing sufficient to toll the statute of limitations.[60]

58. *Id.* at *5–6.

59. Although the mechanics of backdating differs from the mechanics of spring loading, each practice encompasses an element of intentional dissembling, either as to the date of the option grant, or as to the existence of potentially favorable information unavailable to the market and to all other shareholders. *See In re Tyson Foods, Inc. Consol. S'holder Litig.,* 919 A.2d 563, 592, 2007 WL 1018209 (Del.Ch.2007).

60. Further, the existence of fraudulent concealment is supported by the fact that no one noticed these patterns for at least six years. Though *most* alleged backdating occurred more than four years *ago,* before the birth of Sarbanes–Oxley, challenges to this compensation method are a recent phenomenon, and most of the current litigation is born from the Merrill Lynch report and other articles like it, the earliest of which seem to have been published in 2005. The literature on the opportunistic timing of option grants—and the more recent literature on backdating—have focused on post—and pre-grant stock returns as their tool for detecting and investigating abnormal patterns in option grants. In particular, to detect patterns that could be the result of backdating, this research examined whether post-grant returns tended to be positive, whether pre-grant returns tended to be negative, and whether post-grant returns tended to exceed pre-grant returns. Post—and pre-grant returns have then been the tool used by this research to investigate the variables correlated with grant manipulation as

### E. Unjust Enrichment

█ Finally, defendants contend that plaintiff's claim for unjust enrichment fails because there is no allegation that Gifford exercised any of the alleged backdated options and, therefore, Gifford did not obtain any benefit to which he was not entitled to the detriment of another. This defense is contrary both to the normal concept of remuneration and to common sense.

█ Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." [61] A defendant may be liable "even when the defendant retaining the benefit is not a wrongdoer" and "even though he may have received [it] honestly in the first instance." [62]

At this stage, I cannot conclude that there is no reasonably conceivable set of circumstances under which Gifford might be unjustly enriched. Gifford does retain something of value, the alleged backdated options, at the expense of the corporation and shareholders. Further, defendants make no allegations that Gifford is precluded from exercising these options or that the options have expired. Thus, one can imagine a situation where Gifford exercises the options and benefits from the low exercise price. Even if Gifford fails to exercise a single option during the course of this litigation, that fact would not justify dismissal of the unjust enrichment claim. Whether or not the options are exercised, the Court will be able to fashion a remedy. For example, this Court might rely on expert testimony to determine the true value of the option grants or simply rescind them. Either way, Gifford's alleged failure to exercise the options up to this point does not undermine a claim for unjust enrichment Thus, I deny the motion to dismiss the unjust enrichment claim.

## V. CONCLUSION

For the foregoing reasons, I grant defendants' motion to dismiss all claims arising before April 11, 2001. I deny defendants' motion to stay or dismiss with respect to all other claims.

IT IS SO ORDERED.

---

well as to estimate the incidence of such manipulation. *See, e.g.,* Lucian Bebchuk, Yaniv Grinstein & Urs Peyer, *Lucky CEOs* (Harvard Law and Economics, Working Paper Series No. 566, 2006), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=945392 (citing David Yermack, *Good Timing: CEO Stock Option Awards and Company News Announcements,* 52 J. of Fin. 449 (1997)); Erik Lie, *On the Timing of CEO Stock Option Awards,* 51 Mgmt. Sci. 802

(2005); M.P. Narayanan and Hasan Nejat Seyhun, *The Dating Game: Do Managers Designate Option Grant Dates to Increase Their Compensation? Review of Financial Studies* (U. Mich. Working Paper Series, 2006), *available at* http://ssrn.com/abstract=896164).

**61.** *Schock v. Nash,* 732 A.2d 217, 232–33 (Del. 1999).

**62.** *Id.*