OPINION OF THE COURT
Saxe, J.
This appeal involves the concept of demand futility in the context of shareholder derivative litigation. Specifically, the question presented is whether appointment by a board of directors of a special committee to inquire into the challenged conduct by directors and take whatever steps it deemed necessary to rectify the problem, and whether the actions taken by the committee establish as a matter of law that before this litigation began, the board showed itself willing to take the appropriate corrective measures, rendering the litigation unnecessary.
Facts
On March 18, 2006, the Wall Street Journal published an article reporting on a Securities and Exchange Commission (SEC) investigation exploring the possibility that grants of stock options to high-level employees at approximately a dozen large corporations were being illegally backdated (Forelle and Bandler, The Perfect Payday, Wall Street Journal, Mar. 18, 2006, at Al). While proper stock option grants set the option price as of the dates the options are granted, backdated option grants give their recipients the right to purchase company stock at the lower price at which the stock had sold on an earlier date. This *51 practice, the Wall Street Journal article explained, can earn millions of extra dollars for the grantee executives, because when grantees sell stock obtained with backdated stock options, they earn not only any increase in the market value of the stock between the time the option was granted and the time the stock is sold, but also the windfall created by the difference between the stock’s value on the date the option was actually awarded and its lower value on the date to which the option was backdated.
A variety of violations of law may result from the practice of awarding backdated options. Typically, companies grant options under a shareholder-approved plan filed with the SEC that states that any stock options awarded will carry the stock price on the day the company awards them; under these circumstances, the use of any different date and price could constitute securities fraud. In addition, when options are priced below the stock’s fair market value on the day they are awarded, the recipient receives a value that is equivalent to extra pay; yet these backdated options are not acknowledged as an additional cost to the company, which consequently may be overstating its profits (id.).
The Wall Street Journal article described the Journal’s own analysis, the results of which strongly suggested that backdating of stock options was a widespread practice. Among the companies whose questionable stock option grants were named in the article was the nominal defendant here, Comverse Technology, Inc. Specifically, the article discussed two stock option grants awarded to Comverse founder and CEO Jacob “Kobi” Alexander that purportedly were issued on dates on which the price of Comverse stock dipped briefly.
As plaintiffs allege in this shareholder derivative action, the investigation by the Wall Street Journal in the weeks preceding its publication of the article set in motion the events leading to this action. After receiving inquiries from the Wall Street Journal in early March 2006, Comverse held a number of meetings with in-house counsel, and ultimately, on March 10, 2006, Comverse’s board of directors formed a special committee to investigate the timing of the company’s stock option grants and to take appropriate action to deal with any problems uncovered. The committee was comprised of two directors, one of whom, Ron Hiram, had been a director and compensation committee member since June 2001, which included part of the period in which the granting of backdated options is alleged to have occurred. On March 14, 2006, a press release issued by Comverse *52 announced the formation of the special committee and the possibility that the company might need to revise previous years’ financial statements. On March 16, 2006, the committee formally interviewed Alexander, who admitted that, with the assistance of defendant David Kreinberg, at various times Corn-verse’s CFO, vice-president of finance and vice-president of financial planning, and defendant William F. Sorin, a director and corporate secretary of Comverse, he had backdated option grants. The committee soon thereafter interviewed Kreinberg and Sorin as well.
Complaint
This shareholders’ derivative action was commenced on April 11, 2006. At that time, Comverse’s board consisted of defendants Kobi Alexander, William F. Sorin, Itzik Danziger, John H. Friedman, Sam Oolie, and Ron Hiram, as well as nonparty Raz Alon. The complaint names as defendants a number of current and former Comverse officers and directors, as well as the company’s auditor, and seeks restitution and money damages against each defendant, on behalf of Comverse and its shareholders.
The complaint alleges that, beginning in 1991, Kobi Alexander and David Kreinberg, with the assistance of William F. Sorin, repeatedly awarded themselves backdated stock options, despite the company’s approved option plan authorizing the award of options with an exercise price not less than the fair market value of the company’s common stock on the date of the option.
Sorin is said to have orchestrated the paperwork by which the approval of the compensation committee was obtained for the backdated option grants; the compensation committee signed the necessary consents forwarded to them by Sorin, despite the use of an “as of’ date earlier than the date on which it actually approved the option grants. To conceal the improper backdating, some of the individual defendants caused proxy statements to be disseminated that falsely reported the dates of stock option grants, representing that they were granted at fair market value during the relevant period. In addition, when asked directly about the reports pointing toward backdating, defendants Alexander, Kreinberg and Sorin initially falsely stated that Comverse had simply acted quickly on the dates on which Comverse stock prices dipped, so as to provide for and obtain board approval for stock option grants on those dates.
As to those defendants who were members of the company’s compensation committee, John H. Friedman, Ron Hiram, and Sam Oolie, it is alleged that they failed to fulfill their fiduciary
*53 obligation to administer the company’s stock option plans and instead, as a practical matter, ceded the administration of option plans to Alexander and Kreinberg. It is alleged that the compensation committee knowingly or recklessly approved these backdated stock options engineered by Alexander beginning in 1991.
Finally, the complaint asserted that a demand of the board of directors would have been futile because the backdating of options is so egregious that it could not have been the product of sound business judgment.
Comverse successfully moved to dismiss the complaint on the ground that plaintiffs had not complied with the requirement of Business Corporation Law § 626 (c) that the complaint “set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort.” This appeal followed.
Discussion
“Derivative claims against corporate directors belong to the corporation itself” (Auerbach v Bennett, 47 NY2d 619, 631 [1979]), since “[t]he remedy sought is for wrong done to the corporation,” and the recovery sought is for “the benefit of the corporation” (Isaac v Marcus, 258 NY 257, 264 [1932]). The Court of Appeals has “historically been reluctant to permit shareholder derivative suits, noting that the power of courts to direct the management of a corporation’s affairs should be exercised with restraint” (Marx v Akers, 88 NY2d 189, 194 [1996] [internal quotation marks and citation omitted]). In fact, the requirement of Business Corporation Law § 626 (c) that the complaint in a shareholders’ derivative action set forth with particularity either “the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort” is intended to balance the right of a board to manage the corporation’s business with the need for shareholders to be able to safeguard the company’s interests when its officers or directors fail to discharge their responsibilities (see Bansbach v Zinn, 1 NY3d 1, 8 [2003]).
The controlling case in New York on demand futility establishes that there are three types of circumstances in which shareholders may proceed with derivative claims in the absence of a demonstrated attempt to persuade the board to initiate an action itself (see Marx v Akers, 88 NY2d 189, 195 [1996]). The complaint must allege with particularity that “(1) a majority of the directors are interested in the transaction, or (2) the direc *54 tors failed to inform themselves to a degree reasonably necessary about the transaction, or (3) the directors failed to exercise their business judgment in approving the transaction” (Marx v Akers, 88 NY2d at 198).
The initial question is therefore whether plaintiffs’ allegations support their assertion that a majority of the board was so interested or so culpable regarding the complained-of conduct that it would have been futile to demand that the board take legal action to make the company whole.
Interest
Under New York law, a director may be interested under either of two scenarios: self-interest in the transaction or loss of independence due to the control of an interested director (see Bansbach v Zinn, 1 NY3d at 11, citing Marx v Akers, 88 NY2d 189 [1996]). The self-interest of Alexander and Sorin is undeniable and undisputed. We agree with plaintiffs that the requisite self-interest is shown also as to director Itzik Danziger by the allegation that he was a recipient of backdated options worth millions of dollars, whether or not he took part in the actual backdating process.
However, the board as it existed at the time the action was commenced was composed of seven individuals, and we are not convinced that the allegations of the complaint establish that any directors other than the three previously mentioned fall into the category of “interested” under Marx v Akers. Plaintiffs claim that directors Oolie, Hiram and Friedman personally benefitted from the backdating scheme, in that they approved false financial statements as members of the audit committee and approved the backdated options as members of the compensation committee, and then sold some of their own shares of Comverse stock at prices that were artificially inflated due to the backdating and false financial statements. However, the alleged benefit obtained from selling Comverse stock does not appear to differ from a benefit that may have accrued to Comverse shareholders generally. “Directors are self-interested in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally” (Marx v Akers at 202).
Failure to Stay Informed
We agree with plaintiffs that the allegations are sufficient to satisfy the second ground for demand futility described in Marx v Akers. “Demand is excused because of futility when a *55 complaint alleges with particularity that the board of directors did not fully inform themselves about the challenged transaction to the extent reasonably appropriate under the circumstances” (Marx v Akers at 200). The complaint alleges with particularity that the board and its compensation committee failed to exercise reasonably appropriate oversight of the stock option granting process, not even informing themselves to a reasonable degree about the dates assigned to company stock option grants, and approving backdated option grants without reviewing or taking any note of the date on which they were ostensibly awarded or to whom the options were given. Specifically, it is asserted that “unanimous written consents” for grants of stock options were sometimes presented to the compensation committee for signature more than a month after the grant date, in circumstances where the stock price had risen dramatically in the intervening period, and yet were approved unquestioningly. The compensation committee members often approved option grants orally, in direct violation of the company’s bylaws. In addition, the compensation committee had a list of individuals who received option grants in 2001 that contained more than two dozen names of individuals who were not Comverse employees but ostensibly received grants totaling 250,000 options; it is claimed that these options were placed by Alexander in a “slush fund” for later use. Yet not even a cursory check or inquiry was made by the compensation committee; nor was that list even compared against the list of Comverse employees. Even a minimal review would have prompted members of the board and the compensation committee to perform some sort of additional inquiry into the corporation’s use of option grants. The allegations therefore establish that there were grounds for inquiry by these directors and officers, and that no inquiry was made, rendering demand futile under the second test of Marx v Akers.
While the magnitude of the illegal transactions here is not nearly that of the $900 million scheme considered in Miller v Schreyer (257 AD2d 358 [1999]), we nevertheless consider applicable that decision’s ruling that a demand is properly considered futile when “[i]n view of the illegal purpose of the transactions, their magnitude and duration, their timing, and the identity of their beneficiary, the matter should have come to the attention of senior management even on a rudimentary audit” (id. at 362).
*56 Failure to Exercise Business Judgment
The third test of Marx v Akers holds that demand on the board is excused because of futility when “the challenged transaction was so egregious on its face that it could not have been the product of sound business judgment of the directors” (88 NY2d at 200-201). The business judgment rule “bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes,” not actions taken in furtherance of illegitimate purposes (see Auerbach v Bennett, 47 NY2d at 629).
Although the courts of this state have not yet addressed this issue with regard to backdated stock options, it is instructive that Delaware courts have expressly held that backdating stock options is so egregious that it could not have been the product of the sound business judgment of the directors (see Ryan v Gifford, 918 A2d 341, 354, 355-356 [Del Ch 2007]; see also In re Tyson Foods, Inc., 919 A2d 563, 592 n 74 [Del Ch 2007]).
We agree with these Delaware courts: the approval of a decade’s worth of backdated stock options simply does not qualify as a legitimate exercise of business judgment. As the motion court observed, passively rubber-stamping the acts of the active corporate managers does not exempt directors from culpability, and the business judgment rule does not protect them (see Barr v Wackman, 36 NY2d 371, 381 [1975]).
Ramification of Appointment of Special Committee
Despite its conclusion that plaintiffs sufficiently pleaded with particularity facts establishing at least two prongs of the Marx v Akers demand futility test, the motion court concluded that demand futility was not established, because by the time the action was commenced, the corporation had appointed a special committee to conduct its own investigation into the backdating of options, which indicated the board’s willingness to take the actions necessary to protect the interests of the corporation.
We disagree with the motion court’s reasoning. First, the mere creation of a special committee does not in itself necessarily establish the board’s willingness to take all the necessary and appropriate steps to obtain the relief available. Indeed, in a case where a corporation did not even seek dismissal but merely sought a stay of shareholder derivative litigation pending the investigation by its appointed special litigation committee, this Court specifically observed that the mere creation of the com *57 mittee did not alone justify a stay of the shareholder derivative action (see Katz v Renyi, 282 AD2d 262 [2001]).
Here, director Ron Hiram, one of the two appointed members of the special committee, was a director and member of the compensation committee for part of the period at issue, and he allegedly failed to take any steps reasonably necessary to oversee the awarding of options. His appointment as one of the two members of the special committee arguably creates a conflict at the outset, calling into question the committee’s ability to fully investigate the conduct of all potentially liable parties.
In any event, in arguing that the appointment of the special committee definitively shows that a demand to the board would not have been futile, Comverse relies upon case law from other jurisdictions (see e.g. In re Infosonics Corp. Derivative Litig., 2007 WL 2572276, 2007 US Dist LEXIS 66043 [SD Cal 2007]; In re Ferro Corp. Derivative Litig., 2006 WL 2038659, 2006 US Dist LEXIS 11608 [ND Ohio 2006], affd 511 F3d 611 [6th Cir 2008]), in which approaches to the demand futility issue differ greatly from that adopted in Marx v Akers. In this jurisdiction, it is Marx v Akers that provides the framework for determining whether demand futility has been established.
In addition, the actual steps taken by the special committee fail to establish Comverse’s entitlement to dismissal of this action. While it is true that the special committee was promptly appointed once the board was made aware of the Wall Street Journal’s planned exposure of wrongdoing within Comverse, and the committee promptly took certain steps to obtain admissions from the perpetrators of the scheme and to remove them from the board, the complaint’s allegations call into question the special committee’s willingness to take appropriate actions to protect the company and obtain recompense. For example, although Comverse had obtained the resignations of Alexander, Kreinberg and Sorin by May 1, 2006, it continued to retain these individuals as advisors. It was only when the SEC filed civil charges against the three in August 2006, and the United States Attorney for the Eastern District of New York instituted a criminal prosecution against these men, accusing them of conspiracy to violate the federal securities laws’ anti-fraud, wire fraud and mail fraud provisions and demanding restitution in the amount of $51 million, that Comverse severed all remaining ties to them and terminated all agreements with them. Moreover, when director Itzik Danziger, who had allegedly received backdated stock options worth millions of dollars, resigned from *58 the board in September 2006, he was allowed to keep his unexercised backdated options.
Plaintiffs, on behalf of the corporation, contend that relief should be sought not only against the three directors who carried out the scheme, but also against others whose acts or omissions constituted a breach of their fiduciary obligations to the corporation and caused it financial injury. Yet the three directors who carried out the scheme have been the sole focus of the special committee’s actions. Defendants argue that since the special committee has shown a willingness to take action against those placed highest in the corporate order, there can be no question that it would fairly consider the possibility of suing less senior individuals, former directors and officers, and the company’s outside auditors. However, nothing in the record supports this bare assertion. There is no indication that the special committee showed a willingness to go beyond its initial acts of questioning and ultimately removing the three who planned and carried out the scheme—acts that in any event the board was essentially forced to take in the wake of the initial reporting and the subsequent SEC investigation and criminal prosecutions against those individuals.
Defendants assert that it is not for the shareholders to decide which directors to sue, inasmuch as “the decision whether and to what extent to explore and prosecute [claims against corporate directors] lies within the judgment and control of the corporation’s board of directors” (Auerbach v Bennett, 47 NY2d at 631). However, once the plaintiffs have made a showing that the directors not only failed to inform themselves to a degree reasonably necessary about the challenged conduct, but indeed failed to exercise their business judgment when they rubber-stamped the transactions, the board and its chosen committee members will not be fully shielded by the tenets of the business judgment rule {id.). “[T]he rule shields the deliberations and conclusions of the chosen representatives of the board only if they possess a disinterested independence and do not stand in a dual relation which prevents an unprejudicial exercise of judgment” {id.). Since the allegations of the complaint raise legitimate questions as to the committee’s disinterested independence, defendants’ reliance on the directors’ discretion in choosing the direction of litigation does not create grounds for dismissal of the complaint here.
In conclusion, the picture presented in the complaint is that of a special committee taking a tepid rather than a vigorous ap *59 proach to the misconduct and the resultant harm. Under such circumstances, the board should not be provided with any special protection. Therefore, because we cannot conclude that the appointment of the special committee and the steps it has so far undertaken establish as a matter of law the board’s willingness to take appropriate action to protect the interests of the corporation, we hold that the grant of Comverse’s motion to dismiss this shareholder derivative action pursuant to CPLR 3211 was erroneous.
Accordingly, the judgment of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered October 28, 2007, dismissing this shareholders’ derivative action, should be reversed, on the law, without costs, and the complaint reinstated. The appeal from the order of the same court and Justice, entered August 14, 2007, which granted the motion to dismiss the complaint, should be dismissed, without costs, as subsumed within the appeal from the judgment.
Nardelli, Buckley and Catterson, JJ., concur.
Judgment, Supreme Court, New York County, entered October 28, 2007, reversed, on the law, without costs, and the complaint reinstated. Appeal from order, same court, entered August 14, 2007, dismissed, without costs, as subsumed within the appeal from the judgment.