207 P.3d 433 (2009)
In re F5 NETWORKS, INC., Derivative Litigation.
Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust, Glenn Hutton and Allen Easton, derivatively on behalf of F5 Networks, Inc., Plaintiffs,
v.
John McAdam, Alan J. Higginson, Karl D. Guelich, Keith D. Grinstein, Rich Malone, A. Gary Ames, Joann M. Reiter, Carlton Amdahl, Steven Goldman, Brett L. Helsel, Jeff Pancottine, Tom Hull, Steven B. Coburn, Edward J. Eames, Andy Reinland, Jeffrey S. Hussey, John Rodriguez, Defendants, and
F5 Networks, Inc., a Washington corporation, Nominal Defendant.
No. 81817-7.
Supreme Court of Washington, En Banc.
Argued March 24, 2009.
Decided May 21, 2009.
*434 John G. Emerson Jr., Emerson Poynter LLP, Houston, TX, William B. Federman, Sara E. Collier, Federman & Sherwood, Oklahoma City, OK, Benny Goodman, Kevin K. Green, Travis E. Downs, Coughlin, Stoia, Geller, San Diego, CA, Kip B. Shuman, Shuman & Berens, Denver, CO, Kirk Robert Mulfinger, Mulfinger Law Group, Bellevue, WA, Tamara J. Driscoll, Attorney at Law, Seattle, WA, Daniel Morrissey, Spokane, WA, for Plaintiffs.
Brian D. Buckley, Christopher Michael Huck, Jeffrey Bruce Coopersmith, Stellman Keehnel, Russell Brent Wuehler, Kit William Roth, Patrick Timothy Jordan, DLA Piper LLP, Gregory J. Hollon, Robert M. Sulkin, McNaul Ebel Nawrot & Helgren, John Alan Knox, Randy Jarl Aliment, William Kastner & Gibbs, PLLC, Hugh Frederick Bangasser, Philip Mosby Guess, George E. Greer, Lori Lynn Phillips, Orrick Herrington & Sutcliffe LLP, Seattle, WA, Richard A. Kirby, K & L Gates LLP, Washington, DC, for Defendants.
Kristopher Ian Tefft, Association of Washington Business, Olympia, WA, Amicus Curiae on behalf of Association of Washington Business.
Clifford Allen Cantor, Law Offices of Clifford A. Cantor PC, Sammamish, WA, Counsel for Other Parties.
CHAMBERS, J.
¶ Judge Robert S. Lasnik of the United States District Court, Western District of Washington, asked us to answer two certified questions:
"What test does Washington apply to determine whether allegations made pursuant to RCW 23B.07.400(2) by a shareholder seeking to initiate derivative litigation on behalf of a Washington corporation excuse that shareholder from first making demand on the board of directors to bring that litigation on behalf of the corporation?; and
If Washington follows Delaware's demand futility standard, does it also follow the reasoning of Ryan v. Gifford, 918 A.2d 341 (Del.Ch.2007) in cases where the improper backdating of stock options has been alleged?"
Order Certifying Question at 2. We conclude that Washington follows the Delaware demand futility standard and the reasoning of Ryan.

BACKGROUND
¶ 2 In 2006, The Wall Street Journal published an article by Charles Forelle & James Bandler, The Perfect Payday  Some CEOs reap millions by landing stock options when they are most valuable. Luck  or something else? WALL ST. J., Mar. 18, 2006, at A1. It would go on to win the Pulitzer Prize for public service.[1] The article explored *435 what seemed to be a widespread practice of improper backdating of stock options in favor of corporate insiders. As the article explained, stock options
give recipients a right to buy company stock at a set price, called the exercise price or strike price.... Naturally, the lower it is, the more money the recipient can potentially make someday when exercising the options.
Which day's price the options carry makes a big difference. Suppose an executive gets 100,000 options on a day when the stock is at $30. Exercising them after it has reached $50 would bring a profit of $20 times 100,000, or $2 million. But if the grant date was a month earlier and the stock then was at, say, $20, the options would bring in an extra $1 million.
A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price. No stock gain, no profit in the options. Backdating them so they carry a lower price would run counter to this goal, by giving the recipient a paper gain right from the start.
Forelle & Bandler, supra, at A1. Based on governmental, academic, and their own research, the authors noticed that stock options in many corporations were much more likely to be reported and priced as if they were granted on days that the stock was trading comparatively low. They observed:
Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. The SEC is understood to be looking at about a dozen companies' option grants with this in mind.
The Journal's analysis of grant dates and stock movements suggests the problem may be broader. It identified several companies with wildly improbable option-grant patterns. While this doesn't prove chicanery, it shows something very odd: Year after year, some companies' top executives received options on unusually propitious dates....
The analysis bolsters recent academic work suggesting that backdating was widespread, particularly from the start of the tech-stock boom in the 1990s through the Sarbanes-Oxley corporate reform act of 2002. If so, it was another way some executives enriched themselves during the boom at shareholders' expense.
Id. Shortly afterward, the Center for Financial Research and Analysis (CFRA) issued a report titled "Options Backdating, Which Companies Are At Risk?" (CFRA Report), where it "reviewed the option prices of 100 public companies and, based upon an analysis of the exercise prices of option grants with reference to the companies' stock prices, concluded that 17% of the subject companies, were in CFRA's view, `at risk for having backdated option grants.'" Order to Show Cause at 2 (quoting CFRA Report). F5 Networks, Inc., was identified as one of those at-risk companies. In May 2006, a federal grand jury in New York subpoenaed documents relating to its granting of stock options. At about the same time, the Securities and Exchange Commission (SEC) began a similar informal investigation, and this suit was filed. The plaintiffs did not ask the corporation to pursue these claims first, commonly known as making a demand. See Williams v. Erie Mountain Consol. Min. Co., 47 Wash. 360, 362, 91 P. 1091 (1907) (citing 26 Am. & Eng. Enc. of Law 976 (2d ed.1905)).
¶ 3 The plaintiffs are three individual shareholders and two shareholding local affiliates of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust. The defendants are 17 current and former officers and directors of F5. The plaintiffs brought suit under the federal Securities and Exchange Act of 1934 §§ 10(a)-(b), 20(a), 15 U.S.C. §§ 78j(a)(1)-(b), 78t(a), and the Sarbanes-Oxley Act of 2002 § 304, 15 U.S.C. § 7243, for insider trading and filing false and misleading proxy statements and under Washington State law for breach of fiduciary duty, among other things. Plaintiffs also assert violations of the corporation's own policies and of generally accepted accounting principles.
*436 ¶ 4 The core of the plaintiffs' case is the claim that there was a pattern of backdating stock options to hide insider compensation. They have identified 26 stock option grants made between 1999 and 2006. Plaintiffs allege the exercise price of the stock was set for the day of the month it was trading at its lowest 9 of those 26 times, and for the second lowest day of the month 3 of those 26 times. Plaintiffs assert that the odds of this happening randomly are 1 in 2,764,905 and that "on average, between 1999 and 2006, defendants received a 788.6% return on their backdated stock option grants while shareholders received, on average, only a 19.9% return over the same time period." Am. Consolidated Verified Shareholders Derivative Compl. at 22 (Amended Complaint). They claim this was part of "a secret and undisclosed scheme to grant in-the-money stock options to themselves and other F5 insiders by backdating stock option grants to coincide with monthly low closing prices for the Company's common stock and falsify F5's financial and proxy statements." Id. at 1. They claim that the defendants were "materially overstating the Company's net income and earnings per share and understating its net losses and losses per share." Plaintiffs allege defendants "collectively realized over $161.2 million in illicit compensation through the exercise of illegally backdated options grants and subsequent sale of F5 stock." Id. at 2.
¶ 5 While plaintiffs have little direct evidence of wrongdoing, they stress these numbers. They also cite to a Merrill Lynch report that said "`the most effective way to consistently capture low-price days for option grants is to wait until after a stock has risen, then backdate a grant to a day prior to that rise.'" Id. at 21 (quoting without internal pinpoint MERRILL LYNCH, OPTIONS PRICING  HINDSIGHT IS 20/20 (May 22, 2006)).[2] They also note long lags between the time the options were granted and the time they were reported to the SEC, which they claim is evidence of improper backdating. Id. at 23 (quoting M.P. Narayanan, Cindy A. Schipani & H. Nejat Seyhun, The Economic Impact of Backdating of Executive Stock Options, 105 MICH. L.REV. 1597, 1603 (2007)). The Amended Complaint asserts that while "the price of F5 stock was artificially inflated, defendants engaged in a massive insider trading bailout, selling more than $161.2 million worth of F5 stock in violation of securities laws." Id. at 4.
¶ 6 F5 is a Washington technology company. After its compensation practices were identified as being potentially problematic, F5 hired outside legal counsel and accountants and began its own investigation. While that investigation was pending, this suit was filed. Soon afterward, F5 announced that its internal investigation had uncovered stock option irregularities and indicated it would restate its financial records from 1999-2005 to show an additional $22.9 million in stock-based compensation. It appears F5's general counsel resigned in the wake of these disclosures. Plaintiffs allege these facts also support an inference of corporate impropriety.
¶ 7 F5 moved to dismiss the shareholders derivative lawsuit for failure to make a demand. After some initial litigation, Judge Lasnik asked this court to decide how Washington determines whether a shareholder's derivative complaint should be dismissed for failure to make demand and whether we follow Delaware's seminal case, Ryan, in cases of allegedly improperly backdated stock options.

*437 ANALYSIS
¶ 8 The parties dispute many of the underlying facts. However, the questions before us are pure questions of law that we review de novo. See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist., No. 1, 149 Wash.2d 660, 670, 72 P.3d 151 (2003) (citing Rivett v. City of Tacoma, 123 Wash.2d 573, 578, 870 P.2d 299 (1994)); see also Dreiling v. Jain, 151 Wash.2d 900, 908, 93 P.3d 861 (2004).

1. DEMAND
¶ 9 Generally speaking, the corporation's board and officers manage the corporation and make decisions like whether to file a lawsuit. E.g., RCW 23B.08.010. But a corporation's board members and officers manage the company on behalf of the shareholders and are answerable to them in a variety of ways. E.g., RCW 23B.08.080, .090. Shareholders have long had the power to assert a corporation's rights on its behalf when its officers and directors have failed to do so or have done so improperly. Williams, 47 Wash. at 362, 91 P. 1091; see also Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928). This power is not unfettered; shareholders must do more than simply assert a corporation's rights. As far back as 1907, this court noted that generally, a shareholder "must show that he has exhausted all means within his reach to obtain within the corporation... action in conformity to his wishes, and that the managing body of the corporation has refused to sue or defend." Williams, 47 Wash. at 361-62, 91 P. 1091. But we have also long recognized that demand is not required if the plaintiffs can "`clearly show that a demand for corporate action would have been useless.'" Id. at 363, 91 P. 1091 (quoting with approval 26 AM. & ENG. ENC. OF LAW 978). In 1989, the legislature codified the demand requirement:
A complaint in a proceeding brought in the right of a corporation must be verified and allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why a demand was not made. Whether or not a demand for action was made, if the corporation commences an investigation of the charges made in the demand or complaint, the court may stay any proceeding until the investigation is completed.
LAWS of 1989, ch. 165, § 79(2), codified as RCW 23B.07.400(2).
¶ 10 The parties seem to agree that this is a procedural statute and that the legislature has left it to this court to determine its substantive meaning. Plaintiffs argue that Washington is or should be a "demand futility" state. Generally speaking, the demand futility standard is more generous to plaintiffs because it allows them to go directly to court without first asking the corporate board to take action. See generally Aronson v. Lewis, 473 A.2d 805, 815 (Del.1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244, 254 (Del.2000). Under the demand futility standard, courts look to the complaint to determine "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Rales v. Blasband, 634 A.2d 927, 934 (Del.1993).
¶ 11 The corporation, the individual defendants, and amicus Association of Washington Business argue that Washington is or should be a "universal demand" state. Generally speaking, the universal demand standard is less favorable to would-be plaintiffs and more deferential to the decisions of corporate boards and officers because it requires demand except in extraordinary circumstances. See, e.g., Miss.Code. Ann. § 79-4-7.42. They note that many states have recently rejected the Delaware standard as too favorable to shareholder lawsuits. See In re Guidant S'holders Derivative Litig., 841 N.E.2d 571, 574 (Ind.2006) (noting largely statutory trend toward universal demand).
¶ 12 However, it appears to us that most states that have adopted the universal demand standard have done so by statute. See Boland v. Engle, 113 F.3d 706, 712 (7th Cir.1997) ("Eleven states have statutorily imposed a universal demand requirement."); e.g., Wis. Stat. § 180.0742(2) (requiring demand *438 and 90 days "unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period"). This is also the standard embodied in the 2005 Model Business Corporations Act (MBCA), of which our legislature is doubtlessly aware.[3] Our legislature has not followed the states that have taken that step.
¶ 13 The meaning of RCW 23B.07.400(2) is a question of first impression, but our preenactment case law persuades us that Washington is a demand futility state. Long before RCW 23B.07.400(2) was passed by the legislature, this court had approved of shareholder derivative suits being brought in common law, though we observed that they were proper only when "it appears that the corporation is incapable of enforcing a right of action accruing to it or that its officers or directors are acting fraudulently or collusively among themselves or with others." Goodwin v. Castleton, 19 Wash.2d 748, 761, 144 P.2d 725 (1944); accord Elliott v. Puget Sound Wood Prods. Co., 52 Wash. 637, 643, 101 P. 228 (1909) ("`He must make an earnest not a simulated effort with the managing body of the corporation to induce remedial action on their part, and this must be made apparent to the court.'" (quoting Hawes v. City of Oakland, 104 U.S. (14 Otto) 450, 461, 26 L.Ed.2d 827 (1881))); see also Elliott, 52 Wash. at 642-43, 101 P. 228 (quoting Dunphy v. Travelers' Newspaper Ass'n, 146 Mass. 495, 496-97, 16 N.E. 426 (1888) and citing Wolf v. Pa. R.R., 195 Pa. 91, 45 A. 936 (1900)); cf. Haberman v. Wash. Pub. Power Supply Sys., 109 Wash.2d 107, 154, 744 P.2d 1032, 750 P.2d 254 (1987). Read together with the statute, we hold that Washington is a demand futility state.
¶ 14 This result also follows from a plain reading of the statute itself. Again, in most relevant part, it requires shareholders seeking to bring a derivative lawsuit to "allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why a demand was not made." RCW 23B.07.400(2) (emphasis added). While we agree with F5 that the legislature has left it to this court to develop the substantive standards, those standards must accord with the statutory framework. The legislature clearly contemplated that there would be times demand would not be made and did not, as they could, require dismissal. Instead, they required the plaintiff to tell the court why, giving the court the opportunity to decide whether demand was excused. Had the legislature intended to impose a universal demand standard, it would have said so more clearly.
¶ 15 We turn now to whether we specifically follow Delaware's demand futility standard. Delaware law, as the vice chancellor of the Delaware Chancery Courts noted, has at least "some modest importance in the American scheme of corporate governance." Leo E. Strine, Jr., The Inescapably Empirical Foundation of the Common Law of Corporations, 27 DEL. J. CORP. L. 499, 501 (2002). According to the Delaware secretary of state, half of publicly traded corporations and more than 60 percent of the Fortune 500 have chosen to incorporate there.[4] Under Delaware's standard, demand is excused if "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson, 473 A.2d at 814; Beneville v. York, 769 A.2d 80, 85-86 (Del. Ch.2000). If the board of directors in place at the time demand would have been filed did *439 not approve the challenged transaction, demand is excused if the complaint establishes reasonable doubt that the board could exercise "its independent and disinterested business judgment in responding to demand." Rales, 634 A.2d at 933-34.
¶ 16 In a well reasoned opinion, Judge Thomas Zilly of the federal trial bench concluded that Washington would likely follow Delaware's demand futility standard. In re Cray, Inc., 431 F.Supp.2d 1114, 1121 (W.D.Wash.2006) (citing Rales, 634 A.2d at 932 & n. 4 and Aronson, 473 A.2d at 814). We agree. Delaware's courts are well versed in this area. Until our legislature declares otherwise, Washington is a demand futility state and follows Delaware.

2. RYAN

¶ 17 Judge Lasnik has also asked this court to decide if we "follow the reasoning of Ryan v. Gifford, 918 A.2d 341 (Del.Ch.2007) in cases where the improper backdating of stock options has been alleged." Order Certifying Question at 2. In Ryan, the Delaware Chancery Court found that the plaintiffs had shown that demand was futile based on a fair amount of circumstantial evidence, much of it based on statistical methodologies similar to those used by the plaintiffs here. See, e.g., Ryan, 918 A.2d at 344; accord Edmonds v. Getty, 524 F.Supp.2d 1267, 1272-74 (W.D.Wash.2007) (finding demand was excused; nothing that 21 out of 25 discretionary grant dates for stock options were backdated). Among other things, the chancery court found that the use of a compensation committee to approve stock option grants did not insulate the board from disqualification because of the overlapping membership of the two entities. Ryan, 918 A.2d at 353. It also specifically found that "[b]ackdating options qualifies as one of those `rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.'" Id. at 355-56 (alterations in original) (quoting Aronson, 473 A.2d at 815).
¶ 18 We conclude that Ryan follows naturally from Delaware's demand futility standard. It allows plaintiffs to rely on circumstantial evidence that tends to show a pattern indicative of wrongdoing as part of their initial case. Further, in our view, evidence based on an analysis of the dates stock options were granted, the amount of comparative change in the value of the stock generally and the value of the stock options, the change in value of the stock within 20 days of the option grants, and evidence suggestive of wrongdoing, such as the restatements of compensation here, may be sufficient to show demand futility. See id. at 344. Whether or not that evidence is sufficient to prove the case will depend on the evidence as a whole. But we agree with the chancery court that "[g]iven the choice between improbably good fortune and knowing manipulation of option grants, the Court may reasonably infer the latter," at least for the purposes of meeting the threshold burden of showing that a demand upon the board would be futile. Id. at 355 n. 34.

CONCLUSION
¶ 19 We hold that until the legislature says otherwise, Washington follows Delaware's demand futility standard and the reasoning of Ryan.
WE CONCUR: GERRY L. ALEXANDER, C.J., CHARLES W. JOHNSON, BARBARA A. MADSEN, RICHARD B. SANDERS, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, DEBRA L. STEPHENS, JJ.
NOTES
[1] See The 2007 Pulitzer Prize Winners, http:// www.pulitzer.org/works/2007,Public+Service (last visited May 14, 2009).
[2] At least in one similar report:

Merrill Lynch measured the aggressiveness of timing of option grants by examining the extent to which stock price performance subsequent to options pricing events diverges from stock price performance over a longer period of time. "Specifically, it looked at annualized stock price returns for the twenty day period subsequent to options pricing in comparison to stock price returns for the calendar year in which the options were granted." In theory, companies should not generate systematic excess return in comparison to other investors as a result of the timing of options pricing events. "[I]f the timing of options grants is an arm's length process, and companies have [not] systematically taken advantage of their ability to backdate options within the [twenty] day windows that the law provided prior to the implementation of Sarbanes Oxley in 2002, there shouldn't be any difference between the two measures."
Ryan v. Gifford, 918 A.2d 341, 346-47 (Del.Ch. 2007) (alterations in original) (footnote omitted) (quoting exhibit).
[3] No shareholder may commence a derivative proceeding until:

(1) a written demand has been made upon the corporation to take suitable action; and
(2) 90 days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period.
MBCA § 7.42 (2005). Washington's statute is based on the 1984 version of the MBCA, which did not contain the explicit universal demand requirement of the 2005 version. See John Morey Maurice, The 1990 Washington Business Corporation Act, 25 GONZ. L.REV. 373, 374 (1990).
[4] State of Delaware: The Official Website of the First State, http://www.corp.delaware.gov/ aboutagency.shtml (last visited May 14, 2009).