Fabricant, Judith, J.
INTRODUCTION
Donald Gent brought this action pursuant to G.L.c. 156D, §16.02, seeking access to books and records of the defendant corporation, Teradyne, Inc. Now before the Court are the parties’ cross motions for summary judgment. After hearing and for the reasons that will be explained, Gent’s motion for summary judgment will be denied, Teradyne’s motion for summary judgment will be allowed, and Teradyne’s motion to strike will be denied.
BACKGROUND
The record establishes the following facts as undisputed for purposes of the present motions. Teradyne is a Massachusetts corporation, with its headquarters in North Reading. Its stock is publicly traded. Gent owns 575 shares of Teradyne stock, which he purchased in either August or September 200l.[1]
On July 25, 2007, Gent’s counsel sent Teradyne a demand letter on Gent’s behalf, pursuant to G.L.c. 156D, §16.02, seeking access to specified books and records.[2] The demand sought “all documents,” defined to include a wide range of material in various forms, dated from 1995 through the date of production, “created by, distributed to, or reviewed by Teradyne’s Board of Directors (the ‘Board’), or any member or committee thereof, concerning or relating to” a list of seven topics, including any grant of stock options to any executive officer or director, the charters of the compensation, audit, and stock option committees, and any stock option plans or other equity incentive plans.[3] The letter stated three purposes for Gent’s demand: “(i) obtaining accurate and complete information concerning the Company’s stock option grants to its officers and directors; (ii) determining whether the Company has adequately developed and enforced its policies and procedures regarding stock option grants; and (iii) investigating possible mismanagement and breaches- of fiduciary duties by the officers and directors of the Company in connection with its stock option grants, including possible backdating of stock option grants.”
Teradyne’s counsel responded to the demand by requesting documentation of Gent’s status as a shareholder. Gent’s counsel replied by sending a copy of a brokerage statement for June of 2007, but did not supply information indicating when Gent purchased his shares, or whether he still held them. Teradyne responded that the information provided was insufficient to enable it to evaluate the demand. Gent’s counsel’s next response was the filing of this action, on August 23, 2007.[4]
Gent’s complaint alleges that he complied with the requirements of the statute by making demand; that “(b)ased upon a preliminary and proprietary investigation of historical stock option grants at Teradyne,” he stated proper purposes for his demand, as recited in his demand letter; that he made his demand in good faith; that the records he seeks are directly connected with his purpose; and that Teradyne’s refusal was not in good faith. His complaint seeks an order compelling access to the records sought in the demand, along with his attorneys fees and costs.
After proceedings on Teradyne’s motion to dismiss, which this Court denied in an order dated May 8, 2008 [24 Mass. L. Rptr. 56], the parties engaged in discovery, focusing on Gent’s shareholder status and his good faith and purpose for the request. In his interrogatory answers and deposition testimony, Gent acknowledged that the sole area of potential wrongdoing he seeks to investigate is the possible back-dating of stock options. He identified the reported dates of four stock option grants that he contends may have been back-dated: October 26, 1999, October 20, 2000, April 2, 2001, and September 24, 2001. Of these four, only the latest occurred subsequent to the earliest date (August of 2001) when Gent contends that he became a Teradyne shareholder.[5] Teradyne reported the September 24, 2001, option grant in a public filing dated April 22, 2002, identifying certain then current and former executives who received grants.
*519 Teradyne’s share price on September 24, 2001, was $21.90. Twenty trading days later, the share price was $19.89, nine percent lower. Within that twenty-day period the share price fluctuated; it closed below $21.90 on fifteen of the twenty days, and above that level on five days, reaching a peak within the period of $26.06 on October 11, 2001.
Gent’s discovery responses identified three documents as the entirely of the material on which he relies as evidence of possible backdating: a document describing itself as a Merrill Lynch research report on the semiconductor industry, dated May 22, 2006, entitled “Options Pricing — Hindsight is 20/20"; a document bearing a 2006 copyright in the name of Gradient Analytics, Inc., entitled "Risk-Assessment Tool: Options Backdating"; and a Wail Street Journal article dated July 15,2006, entitled “Executive Pay: The 9/11 Factor.”[6]
The Merrill Lynch report recites that its authors analyzed options grant timing for “the semiconductor and semiconductor equipment companies that comprise the Philadelphia Semiconductor Index (SOX),” for the period 1997-2002, in an effort to understand “the extent to which stock price performance subsequent to options pricing events diverges from stock price performance over a longer period of time, as a measure of ”how aggressive the timing of options grants has been." “Theoretically,” according to the authors, “companies should not be generating any systematic excess return in comparison to other investors as a result of how options pricing events are timed.” The results of the analysis, according to the authors, are “notable” in that “the stocks comprising the SOX have consistently generated excess returns during the 20-day period following options grants.” The Merrill Lynch report describes its methodology as based on analysis of option grant information contained in publicly available proxy statements for the period 1997-2002. The authors report that they looked at “annualized stock price returns for the 20-day period subsequent to options pricing in comparison to stock price returns for the calendar year in which the options were granted.”[7] The results, according to the authors, showed average annualized excess returns among the SOX companies of 204% over the six-year period studied. The authors emphasized that “we’re not taking any position in this report on whether companies have actually backdated options or not— the records that we have access to aren’t sufficiently detailed to reach that judgment.”
The report ranks the fifteen companies listed in the SOX according to the level of their so-called “excess" returns. The ranking also includes one additional company, known as Vitesse, that the authors indicate “is already the subject of an SEC investigation related in part to the timing of options grants.” Vitesse appears first in the ranking, with excess returns of 1066%. The authors advise that “investors need to be aware of the possibility of regulatory activity at other companies that turn up high on our ranking.” The report shows annualized excess returns for the six SOX companies at the top of the rankings of between 777% and 312%. The authors note that “the excess returns calculation falls off sharply once one moves further down the list.” For Teradyne, in 8th position among the sixteen companies ranked, the report shows average ánnualized excess returns of 127% over the six-year period. That average reflects a high of 589% for 1999, as well as a low of -219% for 2002. Of the six years studied, the figures for Teradyne indicate returns to management below those for investors in three years (1997, 1998, 2002), and above in three years (1999, 2000, and 2001). The report does not purport to address particular option grant dates separately; it includes Teradyne’s September 24, 2001, options grant in a chart showing price fluctuations in relation to the timing of all of Teradyne’s reported options grants over the six-year period, but does not otherwise discuss that particular grant.[8]
The so-called Gradient report consists of two pages of prose, labeled “Editor’s Comments,” followed by a series of charts, apparently screens downloaded from the web site of an entity identified as Gradient Analyt-ics, Inc. The Editor’s Comments refer to “detailed qualitative work on companies that may have backdated options,” being performed by “our Equity Incentive Analytics (EIA) teams,” and explain that Gradient is making its “level-one quantitative screens” available via its web site “to assist clients in screening their portfolios against the risk of backdating,” because “some [companies] are being brought to light by regulators, the media or other industry professionals before we are able to produce firm-specific reviews.” The comments begin with a caveat: “To be clear, our level-one screen does not establish that backdating has in fact occurred, nor does it imply that regulatory scrutiny is necessarily warranted. Rather, it is a purely qualitative tool used by our analyst team as a first step in identifying those companies that appear to have fortuitously timed some portion of their option grants and may have engaged in backdating.” Further caveats appear at the conclusion of the comments: Gradient’s screens are only a “starting point for company specific analysis.” Further, “[i]n some instances, explanations for grants made around share price reversals . . . are readily apparent,” and “a granular review of Proxy disclosures provides important context for grants made to Proxy-named executives. Detailed analysis is essential to establish the extent of backdating risk associated with grants at specific companies.” Further, “ [qualitative analysis is also critical in identifying inaccuracies that may be present in electronically formatted data. For example, individual or company-level grant data in electronic format may differ from company disclosures as may the number of related shares (or share price) that vary relative to share splits. Our screens do not account for such data *520 discrepancies. This underscores the necessity of diligent qualitative review at the company level when reviewing our screened companies in relation to those that are present in your portfolios.”
The comments explain that Gradient’s “level-one screen” identified approximately 500 companies meeting three criteria: (1) option grants in at least 20% of grant years followed negative three-month share price returns and preceded a rise in share value in the subsequent three months; (2) at least 25% of grants across the years studied were made around what Gradient defined as “material share price reversals,” and (3) at least one grant was made within 5% of the quarterly share price minimum. In addition, the comments explain, Gradient identified “over 1,200 companies where share price reversals were observed with respect to less than 25% of the grants made across all years.” With respect to that categoiy, the comments advise, investors “may want to carefully examine the grant profile” of such companies.
Gradient’s method, the comments explain, began with option grants to “key executives" over a seven-year period from 1996 to 2002 at companies over a specified size. The comments report that Gradient first identified some 3000 companies in which at least one grant during those years occurred “at the inflection point of a share price reversal" or “near the quarterly share price minimum." Next, according to the comments, Gradient selected from that group some 1,710 companies “where the weighted-average return in the three months before the grant dates was negative while the forward-looking three-month return was positive in at least 20.0% of the grant years.” Gradient then reduced the list to some 600 companies by identifying those where “at least 25.0% of the grants made between 1996 and 2002 followed a minimum share price decline of 15.0% (or 30.0%) in the 3 (6) months preceding the date of the grants, and minimum appreciation in share price of 15.0% (or 30.0%) in the 3 (6) months subsequent to the grant dates.” Finally, the comments report, Gradient reduced the list to 502 companies by identifying those “where at least one or more of the grants made between 1996 and 2002 occurred within 5.0% of the quarterly share price minimum.” The companies on that list, according to the comments, “appear to exhibit an elevated risk of backdating (relative to the universe of companies).” The list of 1,710 companies, according to the comments, “provides an important point to continue company specific analysis based on other criteria.”
What follows is a set of charts showing data referring to Teradyne, and then a chart showing data referring to a list of companies, including Teradyne. The list is not labeled to indicate which of Gradient’s categories it encompasses, whether the 502 or the 1710. The data specific to Teradyne, to the extent the Court can understand it without explanation by a witness, appears to indicate the following. Over the seven-year period studied, Teradyne made 207 option grants. Of those, 92.3% met Gradient’s first criterion (share price declined at least 15% in the previous three months or 30% in the previous six months); 80.2% met Gradient’s second criterion (share price rose at least 15% in the subsequent 3 months or 30% in the subsequent six months); but only 7.2% met Gradient’s third criterion (strike price within 5% of quarterly share price minimum).
The Wall Street Journal article, dated July 15, 2006, addresses the topic of stock options granted in the wake of the events of September 11, 2001. The thesis of the article appears to be that companies may have taken advantage of the predictable decline in share prices following those events by choosing that time to grant options, such that management effectively profited from the tragedy. Examples cited in the article include Teradyne, which, the article reports, “that month gave its CEO more than 600,000 options at a price enabling him to buy stock at 24% below its pre-attack level,” despite the death of a Teradyne employee on one of the hijacked flights. The article acknowledges that “[tjhere’s nothing illegal about granting options after the market plunges,” but suggests that such timing “shows the eagerness of some companies to increase their executives’ potential wealth.” The article makes general reference to investigations of possible backdating, and the possibility that “some grants that appear to have been granted in the post-attack period were actually made later, then backdated,” but it does not suggest that the data it reports would support an inference of backdating. Rather, it comments, the grants it reports, “raise a different question: Did companies take unseemly advantage of a national tragedy?”
In some instances, the article reports, “executives appear to have been instrumental in picking their own post-9/11 grant dates. As an example, it cites Teradyne’s CEO and chairman as having received a particularly large grant at a time different from the previous year, based on, according to a spokesperson, a process that began with his own suggestion. The article further reports that the Teradyne CEO still holds the options and has no paper profit because Teradyne’s share price ”is about half the price at which they were awarded." The article attributes its data regarding options grants to public sources.
The record now before the Court indicates that, were this case to proceed to trial, the evidence Gent would present to meet his burden of proof would consist of these three documents, and nothing more. He does not propose to present testimony from the authors of any of these documents, or from any expert witness, nor does he propose to present any analysis from anyone specific to Teradyne’s September 24, 2001, grant, or any other analysis specific to Teradyne. Nor does Gent suggest that his own testimony would add anything of substance; to the contrary, his depo- *521 sitlon testimony acknowledges his lack of any pertinent personal knowledge. Thus, the question presented by these motions is whether these documents, standing alone, are sufficient to meet the plaintiffs burden of proof.
DISCUSSION
Summaiy judgment is properly granted when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c). A fact is material if it would affect the outcome of the case. Carey v. New England Organ Bank, 446 Mass. 270, 278 (2006). A dispute of fact is genuine if the evidence would permit a reasonable fact finder to return a judgment for the non-moving party. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991). The moving party may prevail on its motion by demonstrating by reference to materials properly in the summary judgment record, unmet by countervailing materials, that the party bearing the burden of proof at trial has no reasonable expectation of proving an essential element of its case. Carey, 446 Mass. at 278, citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). To withstand summary judgment, the non-moving party must set forth specific facts with affidavits, deposition testimony, answers to interrogatories, or admissions on file showing that a genuine issue of fact exists. Mass.R.Civ.P. 56(e); NgBros. Constr., Inc. v. Cranney, 436 Mass. 638, 644 (2002).
1. General Laws c. 156D, §16.02 Standard
Chapter 156D, §16.02(b), grants shareholders of a corporation the right, upon written request, to inspect and copy certain corporate books and records, including:
excerpts from minutes reflecting action taken at any meeting of the board of directors, records of any action of a committee of the board of directors while acting in place of the board of directors on behalf of the corporation, minutes of any meeting of the shareholders, and records of action taken by the shareholders or board of directors without a meeting .. .
Section 16.02(c) conditions the right to inspect these records on the shareholder’s satisfaction of four criteria:
(1) his demand is made in good faith and for a proper purpose;
(2) he describes with reasonable particularity his purpose and the records he desires to inspect;
(3) the records are directly connected with his purpose; and
(4) the corporation shall not have determined in good faith that disclosure of the records sought would adversely affect the corporation in the conduct of its business or, in the case of a public corporation, constitute material non-public information at the time when the shareholder’s notice of demand to inspect and copy is received by the corporation.
The comments to §16.02 indicate that “it is generally the shareholder requesting records who has the burden of satisfying the applicable statutory standard.”
At issue in this case are the first and third of the statutory requirements: whether Gent’s demand was “made in good faith and for a proper purpose,” and if so, whether the records he requests are directly connected with his purpose. The comments to §16.02(c) explain that “(t]he phrases ‘in good faith’ and ‘proper-purpose’ are traditional and well understood language in this context.” For example, “[a] ‘proper purpose’ means a purpose that is reasonably relevant to the demanding shareholder’s interest as a shareholder.” See Donaldson v. Boston Herald-Traveler Corp., 347 Mass. 274, 279-80 (1964) (discussing common law right to inspection of books and records, predating §16.02). A purpose to harass the corporation does not meet the statutory standard. Comments to G.L.c. 156D, §16.02(c).
The parties have cited no Massachusetts case law, aside from this Court’s earlier decision on the motion to dismiss in this case, discussing the good faith and proper purpose requirement of § 16.02(c)(1) (24 Mass. L. Rptr. 56). The Court therefore looks to the law of other jurisdictions,[9] particularly the corresponding Delaware statute, Del. Ch. 8, §220.[10] Cases under that statute hold that a purpose to investigate suspected possible waste, mismanagement or other wrongdoing is a proper purpose under that statute, provided that the shareholder presents some evidence that establishes a credible basis from which a court can infer the existence of legitimate issues as to such conduct warranting further investigation. Seinfeld v. Verizon Commc’ns, Inc., 909 A.2d 117, 118, 122 (Del. 2006); citing Thomas & Betts Corp. v. Leviton Mfg. Corp., Inc., 681 A.2d 1026, 1031 (Del. 1996). The court will apply that standard here. Before doing so, it is necessary to address Teradyne’s motion to strike, so as to determine what facts are properly before the Court.
2. Teradyne’s Motion to Strike
Teradyne’s motion to strike seeks to exclude from the summary judgment record all three of the documents that form the sole basis of Gent’s claim: the Merrill Lynch Report, the Gradient Report, and the Wall Street Journal article (collectively, “the reports”). Teradyne contends that the reports are hearsay, not relevant, and not properly authenticated. The Court agrees with Teradyne that, to be properly considered on summaiy judgment, materials offered must be relevant, properly authenticated, and not hearsay. See Mass.R.Civ.P. 56(e). The Court is not persuaded, however, that the reports should be stricken on any of these grounds.
*522 As discussed supra, Gent’s burden in this case is to show the existence of some credible evidence indicating a legitimate issue of possible backdating warranting further investigation.[11] See Seinfeld, v. Verizon Commc’ns, Inc., 909 A.2d at 122, citing Thomas & Betts Corp. v. Leviton Mfg. Corp., Inc., 681 A.2d at 1031. He need not prove that backdating occurred. Nor need he make any showing regarding his own state of mind; what matters, for present purposes, is not what he thought or believed when he made his demand, but rather, whether evidence exists that, objectively considered, would raise a legitimate issue warranting further investigation. Thus, he may properly seek to meet that burden by offering the reports, not to prove the truth of the statements made in them, but to prove simply that they exist. Considered for that purpose, they are not hearsay.[12]
Teradyne’s argument to the contrary rests on a misreading of Thomas & Betts Corp. v. Leviton Mfg. Corp., Inc., 681 A.2d at 1032-33, in which the Delaware Supreme Court affirmed a decision of the Delaware Chancery Court rejecting a shareholder’s demand to review records. The Chancery Court there had admitted out of court statements indicating alleged wrongdoing, but found them not credible, and therefore insufficient to meet the plaintiffs burden. Id. at 1032. On appeal, the Delaware Supreme Court considered whether out of court statements could satisfy a plaintiffs burden under Del. Ch. 8, §220. Id. It did not, as Gent seems to suggest, establish a general rule that such statements cannot be considered; its ruling, rather, was that the Chancery Court had properly discredited the statements admitted in that case, and that the plaintiff could not satisfy his burden by merely asserting a subjective belief based on unreliable third-party statements. Id. See Marmon v. Arbinet-Thexchange, Inc., 2004 WL 936512 at *4, *13-14 (Del.Ch. 2004) (construing Thomas & Betts as indicating that “had this Court found the disputed testimony reliable, it could properly have considered the hearsay testimony to determine whether there was a credible basis to infer that mismanagement had occurred,” and going on to consider out-of-court statements that it deemed reliable); Troy Corp. v. Schoon, 959 A.2d 1130, 1135 and n. 16 (Del.Ch. 2008) (“courts may consider ‘sufficiently reliable’ hearsay evidence in a 220 action”).
As for relevance, the test is very broad. Mass.G.Evid. §401 (2010) defines “relevant evidence” as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.” Here, as to two of the three reports — Merrill Lynch and Gradient — relevance under that standard is plain; the topic of the reports is the likelihood of backdating at a group of companies, including Teradyne, over a period of years including 2001. The Wail Street Journal article is closer to the line, since it mentions the possibility of backdating only in passing, not as its topic. A fact finder could nevertheless fairly consider it as adding something, albeit little, to the plaintiffs effort, if only as evidence of Teradyne’s issuance of options in September of 2001, outside its usual schedule.[13]
Lack of authentication is the strongest argument for striking the reports from the summary judgment record. Massachusetts Rule of Civil Procedure 56(e) limits the summary judgment record to admissible evidence, which may include affidavits “made on personal knowledge,” and “(s]worn or certified copies” of documents referred to in such affidavits. A party offering an exhibit in evidence must provide “evidence sufficient to support a finding that the matter in question is what its proponent claims.” Mass.G.Evid. §901(a) (2010).[14] Here, as noted supra, Gent claims that the documents he offers are, as they appear to be, reports issued by Merrill Lynch and Gradient Analyt-ics, and an article published in the Wail Street Journal He seeks to have the Court receive them as evidence to support his contention that some credible evidence exists indicating a legitimate issue of possible backdating warranting further investigation. For that purpose, the source of the documents is crucial; if they are forgeries, bearing the names of purported sources but not in fact coming from those sources, they provide no support whatever to his position. Yet, as noted supra, Gent offers with them without any authenticating affidavit, certification, or other evidence.[15]
The Court is nevertheless disinclined to strike the materials on this ground. The nature of the materials is such that, unless they are forgeries, which seems highly unlikely, authentication would be a relatively simple matter of requesting and obtaining certifications from the issuing entities or other record keepers. See G.L.c. 233, §79D (regarding certified copies of newspapers kept in public libraries); §79J (regarding certified copies of business records); Mass.G.Evid. §901(b) (10) (authentication by methods provided by statute); §902(f) (certified copies of newspapers in public or college library). Why the plaintiff did not take that step in advance of this motion, so as to be in a position to provide certifications, is unclear, but he could certainly be expected to do so in preparation for trial, if the case were to go to trial. To strike the materials from the summary judgment record would necessarily result in rejection of his claim without even evaluation of the sufficiency of the materials. That would seem to elevate form over substance. The Court will assume, for present purposes, that the materials would be properly authenticated at trial, and will evaluate them on that basis.
3. Good Faith and Proper Purpose
Relying on Melzer v. CNET Networks, Inc., 2007 WL 2593065 (Del.Ch. Sept. 6, 2007), Teradyne argues that Gent, rather than exercising his rights as a shareholder in a good faith effort to uncover potential wrongdoing, has merely supplied his name and share *523 holder status to an entrepreneurial law firm seeking to pursue its own ends. On that basis, Teradyne argues that Gent cannot meet the good faith requirement of G.L.c. 156D, §16.02(c)(1).
The cited decision in Melzer was a ruling on a discovery dispute. In the context of a suit to compel access to books and records under Del. Ch. 8, §220, based on an asserted purpose to investigate suspected backdating, the defendant corporation sought to compel production of a solicitation letter from the plaintiffs attorney to the plaintiff. 2007 WL 2593065 at *1. The court ordered production, reasoning that the letter might be relevant to whether the plaintiff had a proper purpose for the demand that was reasonably related to his status as a shareholder, and observing that a court should deny an inspection demand “where the plaintiffs purpose is vexatious or in bad faith.” Id. The Court did not suggest that the mere fact that an attorney solicited a shareholder to demand inspection would in itself preclude a showing of good faith on the part of the shareholder.[16]
Here, Gent’s deposition testimony leaves no question that his lawyers, rather than he himself, initiated his demand for access, as well as this litigation. The Court is not convinced, however, that those circumstances alone indicate that Gent did not make his demand in good faith. Nothing in the present record indicates that either Gent or his attorneys are motivated by anything other than the hope that access to the records he seeks will uncover evidence of wrongdoing, so as to provide them with a basis to assert a shareholder derivative claim, which could ultimately result in a favorable settlement or judgment. Compare, e.g., Thomas & Betts, 681 A.2d at 1029, 1032-33. The primary goal may, of course, be counsel’s hope of an award of attorneys fees. In that respect, there may be an element of opportunism, but the law does not necessarily condemn that kind of opportunism. To the contrary, attorneys’ entrepreneurship can serve important public interests, by identifying and remedying genuine and serious malfeasance, and deterring similar conduct, in circumstances where individual shareholders alone (or consumers or employees in other types of cases) might lack sufficient incentives to do so.[17] The Court cannot conclude, on the record presented, that the undisputed facts preclude a finding of good faith on the part of the plaintiff.
Delaware cases have recognized “an investigation of corporate mismanagement, waste or wrongdoing” as a proper purpose for an inspection of corporate records under that state’s law. Louisiana Mun. Employees’ Ret. Sys. v. Countrywide Fin. Corp., 2007 WL 2896540 at *10 (Del.Ch. Oct. 2, 2007).[18] Like G.L.c. 156D, §16.02, Delaware law requires that a proper purpose be reasonably related to the shareholder’s interest in the defendant corporation. On that basis, Delaware cases have held that a purpose to investigate suspected wrongdoing, so as to determine whether grounds exist for a derivative suit, is proper only if the shareholder making the demand is one who would have legal standing to bring such a suit. See Polygon Global Opps. Master Fund v. West Corp., 2006 WL 2947486 at *5 (Del.Ch. 2006); see also Saito v. McKesson HBOC, Inc., 806 A.2d 113, 117 (Del. 2002).[19] Under G.L.c. 156D, §7.41, a shareholder may bring a derivative suit only with respect to acts or omissions that occurred while he was a shareholder. Courts have recognized an exception to that rule for circumstances involving a continuing wrong that straddles the date of the shareholder’s purchase, but options backdating does not fall within that exception, since it involves discrete incidents, not continuing wrongdoing. See In re Computer Sciences Corp. Derivative Litigation, 2007 WL2274951 at *5 (C.D.Cal. July 24, 2007) (“plaintiffs cannot use a ‘continuing wrong theory’ exception to assert standing over claims based on option grants occurring before they became shareholders”); Desimone v. Barrows, 924 A.2d 908, 913, 924-26 (Del.Ch. 2007); Ryan v. Gifford; 918 A.2d 341, 358-59 (Del.Ch. 2007); see also John Beaudette, Inc. v. Sentry Ins., 94 F.Sup.2d 77, 107 (D.Mass. 1999) (Massachusetts courts limit the continuing tort theory, for purposes of the statute of limitations, to nuisance and trespass).
Teradyne contends that Gent would not have standing to sue with respect to any of the options grants that he has identified, since he cannot prove that he was a shareholder at the time of any of them. The undisputed facts establish that Gent was not a shareholder at the time of any option grant prior to September 24, 2001, and therefore could not sue as to any earlier grant. As to that one, however, the Court is not persuaded that the undisputed facts, considered in the light most favorable to Gent, establish his lack of standing. The evidence is less than clear in his favor on the point, but his account statement, along with his deposition testimony regarding his experience with such statements, would permit a factfinder to determine that his share purchase occurred before the start of September of 2001.[20] Were a factfinder to so determine, Gent would have standing to sue with respect to that grant, but no other.
Assuming Gent’s standing as to that single grant, Teradyne contends that any suit based on it would be barred by the three-year statute of limitations for tort claims, G.L.c. 260, §2A.[21] Teradyne argues that any cause of action as to that grant accrued, at the very latest, upon publication of the Merrill Lynch report on May 22, 2006.[22] If, as Gent contends, that report in itself provides a credible basis to suspect backdating, the argument goes, then it put him on notice of the claim upon its publication more than three years ago, so that any derivative action Gent would bring after inspection of the requested records would be time-barred.
*524 Although Teradyne’s theoiy has some facial appeal, the Court finds it ultimately unpersuasive. Assuming, for purposes of this analysis, that the Merrill Lynch report suffices to indicate the existence of credible evidence warranting further investigation of possible backdating, so as to meet Gent’s burden under G.L.c. 156D, §16.02, it does not necessarily follow that the information contained in that report, in and of itself, would have provided a sufficient basis for Gent to have filed a complaint that would have survived dismissal under the standard of Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), and for his attorneys to have met the requirements of Mass.R.Civ.P. 11. The Court cannot, at this stage, evaluate what if any further information might appear upon inspection of the records Gent seeks, nor can the Court determine whether any such information might provide grounds for tolling of the statute of limitations, based on fraudulent concealment or other grounds. See O’Connor v. Redstone, 452 Mass. 537, 551 (2008) (equitable tolling); Salvas v. Wal-Mart Stores, Inc., 452 Mass. 337, 375-76 (2008) (tolling based on fraudulent concealment); Aiello v. Aiello, 447 Mass. 388, 404 (2006) (tolling under adverse domination doctrine); Doe v. Harbor Schools, Inc., 446 Mass. 245, 254 (2006) (equitable tolling of breach of fiduciary duty claim); Diamond v. Pappathanasi, No. SUCV2007-4117-BLS1 (Super. Jun. 3, 2009) (same); Ryan v. Gifford, 918 A.2d at 359-60 (fraudulent concealment). If Gent ultimately does bring a derivative claim based on the September 24, 2001, option grant, Teradyne may have a meritorious statute of limitations defense. At this stage, however, the Court cannot determine as a matter of law, based on the record presently before it, that that defense would prevail.
The Court therefore turns to the merits of Gent’s claim for inspection. As discussed supra, Gent’s burden in this action is to show that some evidence exists to establish a credible basis from which a court can infer the existence of legitimate issues of possible waste, mismanagement or wrongdoing warranting further investigation. In light of his deposition testimony, as discussed, that formulation can be stated more narrowly: he must show some evidence that establishes a credible basis from which a court can infer the existence of a legitimate issue as to whether the September 24, 2001, option grant was backdated. His effort to meet that burden rests entirely on the three reports. Thus, the question before the Court is whether those reports, considered together, with nothing else (other than adequate authentication), would meet his burden of proof at trial. Having examined them carefully, and considered them in the face of the share-price information that Teradyne has provided for the period after the September 24, 2001 grant, the Court concludes that they would not.
The Merrill Lynch report, as discussed supra, examines stock price performance of all companies in the Philadelphia Semiconductor Index for a six-year period, attempting to identify so-called “excess” returns by comparison of returns within twenty days after option grants, on an annualized basis, with market returns for corresponding calendar years. Based on that analysis of the entire industry over the entire six-year period, Teradyne’s average so-called “excess” returns fell in the middle of the group, at 127%, and its returns were lower for option grantees than for market investors in three out of the six years studied. The report does not purport to address the September 24, 2001, option grant (or any other specific grant) separately. It does not suggest that its data establishes backdating by any company, and still less does it purport to show backdating of any particular option grant. To the contrary, its authors emphasize that “we’re not taking any position in this report on whether companies have actually backdated options or not — the records that we have access to aren’t sufficiently detailed to reach that judgment.”
The Gradient report, as described supra, contains similar caveats, stating that its analysis does not establish the occurrence of backdating by any company, and is merely “a first step in identifying those companies that appear to have fortuitously timed some portion of their option grants and may have engaged in backdating,” and a “starting point for company specific analysis.” The report points out also that “[i]n some instances, explanations for grants made around share price reversals . . . are readily apparent,” and that “a granular review of Proxy disclosures provides important context for grants made to Proxy-named executives. Detailed analysis is essential to establish the extent of backdating risk associated with grants at specific companies.” It goes on to point out that “(q)uantitative analysis is also critical in identifying inaccuracies that may be present in electronically formatted data,” that its screens “do not account for such data discrepancies,” and that these limitations “underscore! ) the necessity of diligent qualitative review at the company level . . .” With those caveats, the report provides data for a seven-year period, without specificity as to any particular grant. Based on data reflecting 207 option grants over that seven-year period, Teradyne meets two of the criteria Gradient identifies as suggestive of “an elevated risk of backdating (relative to the universe of companies),” but falls far short of the third criterion.
These two reports, considered together, at best provide suggestions as to the type of statistical analysis that one who wants to determine whether a particular option grant at Teradyne might have been backdated could undertake. Gent has not undertaken any such analysis, or engaged an expert to do so, with respect to the September 24, 2001, *525 option grant, or any other. Teradyne, in contrast, has analyzed its market price over the twenty-day period after September 24, 2001. The results, as set forth supra, do not eliminate all possibility that Teradyne backdated that grant — higher prices did occur on a few dates within that period — but they do make it highly unlikely.[23]
The contrast between the evidence Gent offers and that presented in Louisiana Municipal Police Employees’ Retirement System v. Countrywide Financial Corporation, 2007 WL 28965340, is instructive. There the plaintiff, alerted by a newspaper article noting “fortuitous timing” of the defendant’s option grants, retained an expert to conduct a statistical analysis of the defendant’s grants over a six-year period during all of which the plaintiff had owned stock in the company. Based on the expert’s analysis and conclusions, the plaintiff demanded access to records, which the defendant denied. At trial the Court received testimony from both the plaintiffs expert and a defense expert who challenged his methodology and conclusions. Finding the expert’s statistical analysis “just barely sufficient,” the Delaware Chancery Court authorized inspection of a limited category of records. Gent, unlike the plaintiff there, has not engaged an expert to conduct any analysis. If the evidence in that case was “just barely sufficient,” the evidence here falls short of that mark. Id. at *2.
Gent points to Ryan v. Gifford, 918 A.2d at 347-58. That case involved Maxim Integrated Products, the semiconductor companies listed in 7th position in the Merrill Lynch report. Relying primarily on the analysis set forth in that report, the complaint in Ryan alleged that Maxim’s directors had approved specified backdated options grants, in violation of specific provisions of its stock options plan. As described in the court’s decision, the analysis presented in the Merrill Lynch Report showed that the grants in issue “were dated on unusually low (if not the lowest) trading days of the years in question, or on days immediately before sharp increases in the market price of the company,” resulting in average management returns “almost ten times higher” than market returns. Id. at 347.[24] On the defendants’ motion to dismiss, applying the standard applicable to such a motion at the time, the Delaware Chancery Court held the allegations sufficient to state a claim and to show demand futility. Id. at 355, 357-58.[25] A federal district court made the same ruling in In re Maxim Integrated Prod., Inc., 574 F.Sup.2d 1046 (N.D.Cal. 2008), based largely on Ryan. Plymouth County Retirement Association v. Schroeder, 576 F.Sup.2d 360 (E.D.N.Y. 2008), involved similar allegations, based not on the Merrill Lynch report itself, but on correlations derived from a similar statistical analysis of particular option grants by the company in issue, as disclosed in public filings; the federal district court similarly held the allegations sufficient under the standard then applicable to a motion to dismiss. Id. at 374, 383.
These decisions do not assist the plaintiff here. The question presented in the present motions is not whether a hypothetical complaint he might file in the future would state a claim for backdating. The question is whether the evidence he offers in this case suffices to meet his burden under G.L.c. 156D, §16.02. For the reasons already discussed, the Court concludes that it does not.
CONCLUSION AND ORDER
For the reasons stated, the plaintiffs Motion for Summary Judgment is DENIED, and the Defendant’s Motion for Summary Judgment is ALLOWED. The Court orders entry of JUDGMENT of dismissal.

 Gent has no present memory of the date of the purchase except that it was after July of 2001. He has not been able to produce a document reflecting the purchase. He has produced a brokerage statement for the month of September showing his ownership of the stock during that month, but not indicating whether his ownership encompassed the entire month or only part of it. He believes that the purchase occurred in August because, in his experience with such statements, according to his deposition testimony, “the statements cover what was purchased up to the beginning of the statement date.”

 Gent’s deposition testimony establishes, beyond any genuine dispute, that the impetus for the demand came from counsel, not from Gent. It appears that counsel enlisted Gent’s participation after having made his acquaintance in connection with an earlier derivative suit in which counsel had represented a shareholder class of which Gent was a member.

 The letter identified the material demanded, for the period from January 1, 1995, through the date of production, as follows:
all documents (including, but not limited to, memoranda, presentations, reports, correspondence, email, minutes, recordings, consents, agendas, resolutions, summaries, analyses, transcripts, notes, and board or committee packets) created by, distributed to, or reviewed by Teradyne’s Board of Directors ... or any member or committee thereof, concerning or relating to:
1. any grant of Teradyne stock options to any executive officer or director of the Company;
2. the Company’s articles or restated articles of organization and all amendments to them currently in effect;
3. the Company’s bylaws or restated bylaws and all amendments to them currently in effect;
4. the Compensation Committee of the Board’s charter and all amendments to it currently in effect;
5. the Audit Committee of the Board’s charter and all amendments to it currently in effect;
6. the former Stock Option Committee of the Board’s charter and all amendments to it in effect as of the last date on which the Stock Option Committee constituted a committee of the Board; and
7. the Company stock option plants) or other equity incentive plan(s), and all amendments to them, pursuant to which any grant of Teradyne stock options to any executive officer or director of the Company were made.

 Gent himself first saw the complaint at his deposition.

 Gent points out that the dates cited are those on which Teradyne’s public filings report that the options were granted, not necessarily the dates when the grants actually occurred. He does not, however, suggest that any evidence exists to indicate that any of the first three grants cited actually occurred after he had purchased his shares, at the earliest in August of 2001.

 Gent testified at his deposition that he first saw these documents when his attorneys provided them to him in 2008, after the filing of this action. Aside from his deposition testimony identifying copies of the three documents as the items his lawyers provided to him, the record provides nothing to authenticate or explain the documents. Their form tends to suggest that they are what they purport to be — l.e., copies of research reports issued by the two named sources and of an article published in the Waif Street Journal — but no authenticating affidavit or certification has been provided. Nor does the record include any expert affidavit to explain the information set forth in the reports, or to apply the methodology described in the reports to Teradyne’s September 24, 2001, option grant.

 The report does not explain how the authors calculated the annualized figures. See In re Finisar Corp. v. Derivative Litigation, 2009 WL3072882 at * 12 (N.D.Cal 2009) (describing testimony of expert witness who employed “Merrill Lynch methodology" as indicating that annualized return was calculated by multiplying 20-day return by eighteen). The report also does not explain how the authors determined investor annualized return. See id.

 TYhe report indicates an annualized excess return for 2001 as a whole of 168%, based on two grants, the one reported as having occurred on September 24, and the one reported as having occurred on April 2.

 Most states provide shareholders some form of statutory right to inspection of corporate books and records. See CC Bjorklund, Proper Purpose for Shareholder’s Inspection of Corporate Books and Records, 24 Am.Jur. Proof of Facts, 2d 71 (1980 and 2010 Suppl.).

 Delaware Ch. 8, §220, provides, in pertinent part:
Where the stockholder seeks to inspect the corporation’s books and records, other than its stock ledger or list of stockholders, such stockholder shall first establish that:
(1) Such'stockholder is a stockholder;
(2) Such stockholder has complied with this section respecting the form and manner of making demand for inspection of such documents; and
(3) The inspection such stockholder seeks is for a proper purpose.

 As indicated, Gent has conceded that investigation of potential backdating is his only purpose.

 This is not to say that they suffice to meet Gent’s burden. Admissibility is not the same as sufficiency. The Court will address the question of sufficiency infra

 Here again, this is not to say that the reports are sufficient to meet the plaintiffs burden. The Court will address that question infra.

 See Mass.G.Evid. §901(b)(l) (2010) (indicating means of proof of authenticity); also Commonwealth v. LaCorte, 373 Mass. 700, 704 (1977) (“Proof of authenticity usually takes the form of testimony of a qualified witness either (1) that the thing is what its proponent represents it to be, or (2) that circumstances exist which imply that the thing is what its proponent represents it to be”); Commonwealth v. Wheeler, 42 Mass.App.Ct. 933, 935 (1997).

 The reports do not fall within any of the categories of self-authenticating materials set forth in Mass.G.Evid. §902(a)-(n).

 Teradyne also cites Rothenberg v. Security Mgmt. Co., Inc., 667 F.2d 958, 959, 961-63 (11th Cir. 1982). That decision involved a purported class action asserting shareholder derivative claims; the court affirmed dismissal on the ground that the named plaintiff did not “fairly and adequately represent the interests of other shareholders” due to her lack of familiarity with the suit, unwillingness to learn about it, and lack of personal commitment to it. The issues presently before this Court do not include whether Gent would be an appropriate class representative in a derivative suit that he has yet to bring. Rothenberg does not address the question of whether a shareholder who lends his name to an attorney’s effort to obtain access to corporate records thereby acts in bad faith.

 This Court is not in a position to evaluate the costs and benefits of such litigation, either in this particular case or as a general matter; that is a question for legislators and other policy makers.

 Various types of suspected wrongdoing can provide a proper purpose for an inspection demand. See e.g., Security First Corp. v. United States Die Casting and Dev. Co., 687 A.2d 563, 567 (Del. 1997) (mismanagement); Thomas & Betts, 681 A.2d at 1031 (mismanagement and waste); Melzer v. CNET Networks, Inc., 934 A.2d at 916-18 (backdating of stock options); Carapico v. Philadelphia Stock Exch., Inc., 791 A.2d 787, 792 (Del.Ch. 2000) (mismanagement and waste).

 Saito acknowledges that shareholders might, in some circumstances, properly seek to investigate wrongdoing with a view toward remedial action other than a derivative suit: “They may seek an audience with the board to discuss proposed reforms or, failing in that, they may prepare a stockholder resolution for the next annual meeting, or mount a proxy fight to elect new directors.” 806 A.2d at 117. Nothing in this record suggests that Gent contemplates any such effort with respect to events that concluded some nine years ago.

 As the Court observed at argument, it is puzzling that the parties have not been able to identify some document, in the custody of some third party involved in the transaction, that would establish the date of Gent’s acquisition of his shares.

 Nor this purpose the parties appear to agree that any derivative claim Gent might bring would be for the tort of breach of fiduciary duly, which would be subject to the three-year statute of limitations for torts. See Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 517 (1997).

 Teradyne’s initial position is that any cause of action actually accrued in April of 2002, when Teradyne disclosed the September 24, 2001, grant in public filings, providing the same data that underlies the Merrill Lynch and Gradient reports.

 The Wail Street Journal article, as described supra adds only the fact of the September 24, 2001, grant, and its deviation from the company’s usual timing. It makes no suggestion of backdating; to the contrary, it provides an entirely different potential explanation for the timing, based on the opportuniiy provided by the events of September 11, 2001.

 The Merrill Lynch report reflects an average “management excess return” rate of 215% for Maxim, compared to Teradyne’s 127%.

 The court did dismiss claims relating to options issued before the plaintiff became a shareholder. Id. at 359.